JUAN CELSO GONZÁLEZ VÉLEZ, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE PONCE, HON. J. M. ALMODÓVAR ACEVEDO, JUEZ, demandado; EL PUEBLO DE PUERTO RICO, interventor.

Número 1998.

*Sometido:* 4 de mayo de 1953. *Resuelto:* 30 de diciembre de 1953.

588

*Aníbal Padilla,* abogado del peticionario; *Hon. Secretario de Justicia José Trías Monge (Juan B. Fernández Badillo, Secretario de Justicia Interino,* en el alegato) y *Rafael L. Ydrach Yordán* y *Jaime García Blanco, Fiscal Auxiliar y Fiscal Especial, respectivamente, del Tribunal Supremo,* abogados del interventor; *J. J. Saúl Dalmáu,* por el *amicus curiae.*

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

Con posterioridad al 15 de octubre de 1952, Juan Celso González fué convicto de acometimiento y agresión grave ante el Tribunal de Distrito. Luego apeló para ante el Tribunal Superior, radicándose debidamente los autos en dicho tribunal. El 17 de diciembre de 1952 el acusado radicó una moción solicitando juicio *de novo* en el Tribunal Superior.

La sección 19 de la Ley núm. 11, Leyes de Puerto Rico, 1952, Sesión Extraordinaria (pág. 31), conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, abolió el derecho a juicio *de novo* en apelación del Tribunal de Distrito al Tribunal Superior que existía anteriormente a tenor con la Ley del 11 de marzo de 1908, Leyes de Puerto Rico, 1908, pág. 124.([1]) En lugar de dicho juicio *de novo,*

([1]) La Ley de 1908 fué enmendada por la Ley núm. 13, Leyes de Puerto Rico, 1917, Tomo II (pág. 225); la Ley núm. 2, Leyes de Puerto Rico, 1929 (pág. 123); y la Ley núm. 31, Leyes de Puerto Rico, 1934 (pág. 293).

la sección 19 proveyó la revisión en apelación por el Tribunal Superior de las sentencias dictadas por el Tribunal de Distrito, basada en el récord ante este último tribunal. Y la sección 37 de la Ley núm. 11 dispuso que la sección 19, creando este nuevo método de revisión, empezaría a regir el 15 de octubre de 1952. No empece las disposiciones de las secciones 19 y 37, el acusado sostuvo en su moción que tenía derecho a un juicio *de novo*. Señalaba la disposición de la sección 19 al efecto de que el procedimiento de apelación en tales casos se seguiría a tenor con las reglas promulgadas por el Tribunal Supremo, y sostuvo que el nuevo método de revisión no puede empezar a regir hasta que este Tribunal promulgue tales reglas.

El acusado admitió que el 7 de octubre de 1952 este Tribunal promulgó las Reglas que Gobiernan las Apelaciones del Tribunal de Distrito al Tribunal Superior, para tener efecto el 15 de octubre de dicho año. Sin embargo, sostuvo el acusado que estas Reglas todavía no han empezado a regir porque las mismas no han sido remitidas a la Asamblea Legislativa a tenor con la sección 6 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico. [2] En su consecuencia alegó el acusado que las anteriores disposiciones de la Ley de 1908, según ha sido enmendada, para un juicio *de novo*, todavía están en vigor. Por los mismos fundamentos, el acusado asumió también la posición de que no venía obligado a radicar ante el Tribunal Superior un alegato con señalamiento de errores, según se dispone en la Regla 7 de las

[2] La sección 6 del Artículo V lee como sigue: "El Tribunal Supremo adoptará, para los tribunales, reglas de evidencia y de procedimiento civil y criminal que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes. Las reglas así adoptadas se remitirán a la Asamblea Legislativa al comienzo de su próxima sesión ordinaria y regirán sesenta días después de la terminación de dicha sesión, salvo desaprobación por la Asamblea Legislativa, la cual tendrá facultad, tanto en dicha sesión como posteriormente, para enmendar, derogar o complementar cualquiera de dichas reglas, mediante ley específica a tal efecto."

Reglas que Gobiernan las Apelaciones del Tribunal de Distrito al Tribunal Superior. ([3])

El Tribunal Superior declaró sin lugar la moción del acusado para la celebración de un juicio *de novo* en dicho Tribunal. Resolvió que las Reglas que Gobiernan las Apelaciones del Tribunal de Distrito al Tribunal Superior empezaron a regir el 15 de octubre de 1952, no empece el hecho de que las mismas no habían sido previamente remitidas a la Asamblea Legislativa. Debido a que la cuestión sobre su derecho a un juicio *de novo* era una nueva, el Tribunal Superior concedió al acusado diez días adicionales para radicar su alegato bajo la Regla 7. En vez de radicar un alegato, el acusado presentó una solicitud de *certiorari* ante nos a fin de revisar la resolución del Tribunal Superior declarando sin lugar su moción de juicio *de novo*. En vista de la importancia del asunto, oímos a las partes, tanto oralmente como por escrito, antes de pasar sobre la solicitud de certiorari.

I

*Poder de los Tribunales para Adoptar Reglas en General*

La facultad de los tribunales para reglamentar su propio procedimiento ha tenido un historial de ligeros altibajos. Roscoe Pound ha demostrado que en Inglaterra la reglamentación del procedimiento ha pasado por cuatro etapas. Primeramente, el procedimiento era regido por la costumbre. En segundo lugar, se efectuaron cambios mediante reglas de los tribunales. En tercer lugar, el Parlamento intervino en el asunto e hizo cambios abarcadores. En cuarto lugar, desde 1873 los ingleses han vuelto a la reglamentación

---

([3]) La Regla 7 lee en parte como sigue: "Dentro de los quince (15) días de notificadas las partes de la radicación de los autos en apelación, o dentro de la prórroga que se concediere con tal fin, el abogado del apelante presentará al Tribunal Superior su alegato que contendrá una relación fiel y concisa de los hechos del caso, así como un señalamiento de los errores que a su juicio cometió el Tribunal de Distrito. Cada error se señalará y discutirá separadamente. Si el apelante no radicare su alegato dentro del término fijado o dentro de la prórroga concedídale, el tribunal motu proprio o a petición de la parte apelada desestimará el recurso."

del procedimiento mediante reglas de los tribunales. Pound, *The Rule–Making Power of the Courts*, 12 A.B.A.J. 599; *Winberry* v. *Salisbury*, 74 A.2d 406, 412 (N. J., 1950).

Por consiguiente, Pound, supra, concluyó que (pág. 601) ". . . si algo se recibió de Inglaterra, como parte de nuestras instituciones, fué que la promulgación de estas reglas generales de práctica era una función judicial. En verdad, así muy bien se entendía en los comienzos del derecho americano. Durante estos mismos comienzos, el Tribunal Supremo de los Estados Unidos, al contestar una consulta del Procurador General, dijo que por el momento regiría la práctica de la corte del *King's Bench*, pero que pronto el tribunal promulgaría algunas reglas de procedimiento." (⁴)

Sin embargo, no puede negarse que, al igual que en Inglaterra, como a mediados del siglo XIX, las asambleas legislativas estatales en los Estados Unidos transgredieron en el campo del procedimiento, que anteriormente incumbía a la rama judicial. Pound, supra, atribuye este resultado provisional a cuatro factores: (1) la hegemonía legislativa, basada en la actitud de omnisapiencia legislativa, que existía en dicha era; (2) el ultraconservadorismo de la profesión legal en dicha época; (3) la falta de modelos, como los que existían en el campo del derecho sustantivo en Inglaterra y en Europa continental, para el desarrollo de un procedimiento adecuado por los tribunales; (4) el entrenamiento en calidad de aprendices de los abogados de esa época inevitablemente tendía a poner énfasis en el entrenamiento en los detalles de procedimiento; esto a la vez inducía a los abogados a considerar el procedimiento como parte del derecho sustantivo; y este último campo debe, desde luego, dejarse a la legislatura de conformidad con la separación de poderes.

---

(⁴) Esa manifestación de la Corte Suprema de los Estados Unidos se encuentra en 2 Dall. 411, 413–14 (1792), 1 L. ed. 437. Al mismo efecto, Pound, *Rules of Court in New Jersey*, 66 Harv. L. Rev. 28, 35–36, escolio 18; *Winberry* v. *Salisbury*, supra, pág. 413.

Afortunadamente, ha habido un renacimiento del concepto de la promulgación de reglas de procedimiento por la rama judicial. Los tribunales, las asambleas legislativas y las convenciones constituyentes se dieron cuenta gradualmente de que la facultad para estructurar su propio procedimiento debe descansar en los tribunales si es que éstos han de administrar justicia eficazmente. (⁵) Como resultado de esto, hemos pre-

(⁵) Pound, supra, págs. 601–2, expuso el caso en favor del poder de los tribunales para promulgar reglas, en esta forma:

"En realidad, el procedimiento de los tribunales es algo que pertenece a los tribunales más bien que a la asamblea legislativa, ya miremos el asunto analítica o históricamente. Es lamentable que las cortes lo desecharan. Analíticamente, no está la asamblea legislativa más justificada en imponer a las cortes una camisa de fuerza de procedimiento estatutario, que si hiciera lo mismo a la rama ejecutiva. Nadie supone que las cortes pueden imponer sus ideas generales de procedimiento ejecutivo. Ni se hubiese arraigado la idea de que las minuciosidades del procedimiento judicial pueden ser establecidas por los legisladores, de no haber sido por métodos prácticos de aprendizaje de la mayor parte de la profesión, que los llevó a sentir que toda la ley estaba envuelta en procedimiento y que por ende la asamblea legislativa debe prescribir el procedimiento judicial si no quiere abdicar el control sobre la ley. . . .

"Es lamentable que las cortes americanas desistieran de su control sobre el procedimiento. Es posible que actualmente, luego de setenta y cinco años de códigos y leyes de práctica y mucha legislación procesal, no podamos ir tan lejos como para decir que tal intervención legislativa con las operaciones de un departamento de igual rango es inconstitucional. Quizás el fundamento es tan discutible que las cortes no hubieran podido resistir la anexión legislativa de ese campo. Hoy día, posiblemente, debemos conceder que la asamblea legislativa puede aprobar códigos de procedimiento y detalladas leyes de práctica. De igual modo, sin embargo, debemos insistir en que la asamblea legislativa no debería hacer tal cosa, no meramente a base de conveniencia y en aras de una mejor y más eficaz administración de justicia, sino como una señal del respeto debido al sistema constitucional de la separación de poderes. Ninguno de los departamentos de igual rango de nuestro gobierno puede operar eficazmente si las minuciosidades de sus operaciones de procedimiento, diferenciadas del derecho sustantivo que aplica o administra, son dictadas por otro departamento. El hecho de que la asamblea legislativa pueda reclamar tal poder es algo que nos viene de las reclamaciones extravagantes de las asambleas legislativas en el período de la hegemonía legislativa. La asamblea legislativa debiera dejar el procedimiento judicial a la judicatura, de igual forma que la judicatura debe dejarle a aquélla el procedimiento legislativo (excepto cuando el mismo es a veces prescrito por disposiciones constitucionales del estado). Ciertamente, si las asambleas legislativas eligen abdicar el poder que han adquirido y dejar el procedimiento judicial a las cortes, adonde pertenece, no puede haber ninguna objeción constitucional."

senciado en el siglo veinte un tremendo resurgimiento de la facultad de los tribunales para reglamentar su propio procedimiento. (⁶)

Estos puntos de vista fueron reiterados recientemente en Pound, supra, 66 Harv. L. Rev. 28, 32, 40, donde señaló Pound que "Una asamblea legislativa tiene actualmente que bregar en un corto período con un gran número de proyectos de ley. Además, los legisladores electos por el pueblo . . . tienen más interés en aquellas medidas que atraigan el interés público que en menudencias áridas de procedimiento legal. Las cuestiones políticas, asignaciones, cuestiones económicas, la maquinaria del gobierno, las disposiciones para la administración y la policía, la seguridad y el bienestar social, y los proyectos humanitarios deben gozar de prioridad." Continúa Pound citando a Cardozo, A Ministry of Justice, 35 Harv. L. Rev. 113, 114, en cuanto a que "La asamblea legislativa, informada sólo superficial y esporádicamente de las necesidades y problemas de los tribunales, sin un consejo experto, responsable, desinteresado o sistemático en cuanto al funcionamiento de una u otra regla, remienda el material aquí y allá, y a menudo echa a perder lo que trataba de componer."

No está solo Pound en cuanto a estos puntos de vista. Prácticamente todos los eruditos y tribunales que han escrito sobre esta materia, los comparten. Clark y Rogers, The New Judiciary Act of Puerto Rico: A Definitive Court Reorganization, 61 Yale L. J. 1147, 1149, escolio 9, y autoridades allí citadas; Clark y Wright, The Judicial Council and the Rule-Making Power: A Dissent and a Protest, 1 Syracuse L. Rev. 346, 363; Gertner, The Inherent Power of Courts to Make Rules, 106 U. Cin. L. Rev. 32; The Improvement of the Administration of Justice, A: Handbook Prepared by the Section of Judicial Administration, A.B.A., págs. 11–12 (3ra. ed. 1952); Winberry v. Salisbury, supra, pág. 413–4; Anotaciones, 110 A.L.R. 22; 158 A.L.R. 705.

(⁶) The Improvement of the Administration of Justice, supra, dice a la pág. 11: "El movimiento para el retorno a los tribunales de la facultad para promulgar reglas comenzó hace muchos años, con la aprobación de la Ley de la Judicatura del Tribunal Supremo Inglés de 1873. Pocos estados se unieron a esta tendencia antes de 1930, pero desde entonces, un número creciente de jurisdicciones ha aprobado estatutos o disposiciones constitucionales facultando al más alto tribunal del estado a reglamentar la práctica y el procedimiento en todos, o prácticamente todos, los tribunales del estado, hasta que actualmente los 48 estados están divididos por igual entre aquéllos en que el tribunal tiene tal facultad y aquéllos en que no la tiene. En un número de estos últimos estados se están realizando diligentes esfuerzos encaminados a la aprobación de una ley sobre la facultad para adoptar reglas."

Véanse Vanderbilt, Minimum Standards of Judicial Administration, pág. 97 et seq.; Pound, Appellate Procedure in Civil Cases, pág. 323; Clark y Wright, supra, pág. 351; Clark, The Federal Rules in State Practice, 23 Rocky Mountain L. Rev. 520; Clark, The Influence of Federal Procedural Reform, 13 Law and Contemporary Problems, 144, 160 et seq.; Clark en Code Pleading, 2da. ed., pág. 50 et seq.; 1942 Annual Survey of

594

■ Mientras se retornaba al principio fundamental de que los tribunales adoptaran sus reglas de procedimiento, algunos eruditos y varios tribunales afirmaban que los tribunales tienen el poder *absoluto* de reglamentar su propio procedimiento. Por "poder absoluto" estas autoridades querían decir que la asamblea legislativa nunca puede aprobar un estatuto sobre esta materia. Su tesis consiste en que el poder absoluto de adoptar reglas es inherente a los tribunales y si la asamblea legislativa interviene con él, viola así la doctrina de separación de poderes.(7) Pero la jurisprudencia está

*American Law*, págs. 791–3; 1948 id., págs. 945–6; 1951, id., págs. 799–800; Peterfreund, *The Essentials of Modern Reform in the Litigative Process*, 287 *The Annals, American Academy of Political Science* 154, 161.

Según lo expone el Juez Presidente Sr. Vanderbilt en *Winberry* v. *Salisbury*, supra, pág. 413: "La tendencia a través de la nación ha sido conferir a los tribunales el poder de reglamentar sus propios procedimientos y administración y entonces hacerlos responsables de los resultados."

(7) Pound, supra, 66 Harv. L. Rev. 28, 37, dice que "Debe recordarse que sin la disposición constitucional los tribunales tenían poder inherente para promulgar reglas de procedimiento." Wigmore, *All Legislative Rules for Judiciary Procedure Are Void Constitutionally*, 23 Ill. L. Rev. 276, está de acuerdo con esta tesis. Véanse, además, Clark en *Code Pleading*, 2da. ed., págs. 61–2, escolio 166; Gertner, supra, págs. 44–45; Keeffe, Brooks y Greer, *86 or 1100*, 32 Cornell L. Q. 253, 263; Trumbull, *Judicial Responsibility for Regulating Practice and Procedure in Illinois*, 47 N. W. U. L. Rev. 443, 444–49; *Notes*, 29 Ill. L. Rev. 911; Anotaciones, 110 A.L.R. 22, 23, 158 A.L.R. 705, 706.

El Comité Ejecutivo de la Conferencia Nacional de Comisionados sobre Leyes Estatales Uniformes dijo, en relación con la proposición de que la Conferencia redactara una Ley Uniforme Estableciendo la Facultad para Promulgar Reglas en los Tribunales, lo siguiente: "El Comité cree que tal ley no es necesaria, toda vez que el poder inherente de los tribunales para adoptar reglas ha sido cuestionado en muy pocos estados, y tal legislación sería necesaria solamente en aquellos estados donde tal poder inherente ha sido cuestionado." *Handbook of the National Conference of Commissioners on Uniform State Laws*, 1952, pág. 93.

En algunos estados donde se han aprobado estatutos sobre autorización confiriendo a los tribunales la facultad de adoptar reglas, los tribunales han adoptado la actitud de que tales estatutos nada añaden al poder inherente ya gozado por los tribunales. Aún donde existe tal base estatutaria, estos tribunales han sostenido la validez de reglas a base de su poder inherente sin descansar en la autoridad legislativa. *Epstein* v. *State*, 128 N.E. 353 (Ind., 1920) es uno de tales casos. Y véase a Gertner, supra, pág. 46.

Un caso cumbre que trata de este asunto es el de *Hanna* v. *Mitchell*, 196 N.Y.S. 43 (App. Div., First Dept., 1922). En dicho caso la corte sos-

dividida en esta materia. Anotaciones, 110 A.L.R. 22; 158 A.L.R. 705. Y no importa cuán sabia pueda ser esta opinión analíticamente, es muy difícil afirmar, en vista del historial

---

tuvo una regla que permitía sentencias sumarias y resolvió que un estatuto que delegaba a una convención de jueces del tribunal supremo la facultad de promulgar reglas de procedimiento no era inválida como una delegación de poder legislativo porque el poder de adoptar reglas de procedimiento es un poder judicial inherente a los tribunales. La corte dijo a la pág. 51–52:

"La facultad de promulgar reglas era inherente a los Tribunales del *King's Bench, Common Pleas* y *Exchequer* de Inglaterra, y hubiese sido conferida al Tribunal Supremo sin la expresa concesión de tal facultad hallada en la Ley. Como hemos demostrado, el derecho común de Inglaterra y las leyes de la Asamblea Legislativa Colonial vinieron a ser la ley en este estado en virtud de las disposiciones de la Constitución arriba citadas. El Tribunal Supremo ejercitó esta facultad durante 86 años antes de que hubiera una asamblea legislativa en el estado de Nueva York, y durante 137 años antes de la adopción del título 3 del capítulo 1 de la parte 3 de los Estatutos Revisados, que contiene la sección que aquí se alega es la fuente de tal facultad. Dicha sección era meramente el reconocimiento legislativo de una facultad que por mucho tiempo había existido, comprendida junto a otras leyes preexistentes en los Estatutos Revisados . . . El poder de adoptar reglas que gobiernen la práctica y procedimiento en los tribunales es una facultad judicial, no legislativa. . . .

"Concluímos que la facultad para promulgar reglas de práctica es un poder judicial inherente y expresamente conferida a la Corte Suprema, y que la ley que creó la convención para adoptar reglas de práctica civil meramente dispuso un método y manera mediante los cuales el Tribunal podía ejercitar su deber judicial conveniente y prontamente, y no era en sentido alguno una delegación por parte de la Asamblea Legislativa de un poder legislativo."

Al mismo efecto, *General Inv. Co.* v. *Interborough Rapid Transit Co.,* 139 N. E. 216, 220 (N. Y., 1923).

Otro caso cumbre que sostiene que la facultad de adoptar reglas de procedimiento es inherente a la rama judicial es *Kolkman* v. *People,* 300 Pac. 575, 584 (Colo., 1931). Véanse además *State* v. *Roy,* 60 P.2d 646 (N. M., 1936); *De Camp* v. *Central Arizona Light & Power Co.,* 57 P.2d 311 (Ariz., 1936). *Cf.* Rottschaefer en *Constitutional Law,* págs. 52–3; Clark y Wright, supra, pág. 366, escolio 96.

Varios casos han resuelto que estatutos procesales son inconstitucionales por menoscabar la facultad inherente a la judicatura para promulgar reglas. *Agran* v. *Checker Taxi Co.,* 105 N.E.2d 713 (Ill., 1952); *Atchison, T. & S. F. Ry. Co.* v. *Long,* 251 Pac. 486 (Okla., 1926); *Schario* v. *State,* 138 N. E. 63 (Ohio, 1922); *Solimito* v. *State,* 122 N. E. 578 (Ind., 1919); Trumbull, supra, pág. 448, escolio 42. En situaciones similares, en esta jurisdicción hemos evitado declarar nulos estatutos que requieren de los tribunales que resuelvan los casos dentro de un período específico al interpretarlos como meramente directivos y no mandatorios. *Bages & Cía., Inc.* v. *Corte,* 65 D.P.R. 218, y casos citados.

del siglo XIX que, solamente a base de la doctrina general de separación de poderes, los tribunales tienen hoy día un poder *inherente* para adoptar reglas, el cual es tan amplio que la asamblea legislativa no tiene facultad alguna para aprobar estatutos reglamentando el procedimiento en los tribunales. A este respecto, merece señalarse que el poder absoluto de adoptar reglas que existe en la actualidad en Nueva Jersey no está basado en el poder inherente y en la separación de poderes. Más bien, la reciente constitución de dicho estado contiene una cláusula expresamente confiriéndole a la Corte Suprema esta facultad absoluta. [8]

■ Por otro lado, decir que los tribunales no tienen la facultad *absoluta* inherente de adoptar reglas, no quiere decir que éstos no tienen poder inherente alguno en este campo. [9]

[8] En Nueva Jersey la Constitución dispone que "El Tribunal Supremo adoptará reglas para la administración de todos los tribunales del Estado y, sujeto a la ley, la práctica y procedimiento en tales tribunales." En *Winberry* v. *Salisbury*, supra, el Tribunal Supremo de Nueva Jersey decidió que "sujeto a la ley" no significaba sujeto a la legislación en el campo del procedimiento. Significaba más bien que las reglas de procedimiento estaban sujetas a—no podían inmiscuirse en—la ley sustantiva según ésta se diferencia del procedimiento. El tribunal por tanto concluyó que su facultad para adoptar reglas no estaba sujeta a legislación sobre procedimiento; su única limitación es que está restringida a procedimiento y a administración. Se hace una ligera referencia a la pág. 412 al poder "inherente" de los tribunales en cuanto a la promulgación de reglas como una excepción a "una manifestación ultrasimplificada de la doctrina de separación de poderes . . ." (Esto contrasta con la teoría de aquéllos que predican la facultad inherente para la adopción de reglas precisamente en la separación de poderes, véase escolio 7). Pero en su opinión el Juez Presidente Vanderbilt descansa casi exclusivamente· en la historia y en el lenguaje específico de la disposición que hemos citado de la constitución de Nueva Jersey. Para criterios opuestos con respecto al caso de *Winberry*, compárese Kaplan y Greene, *The Legislature's Relation to Judicial Rule—Making: An Appraisal of Winberry* v. *Salisbury*, 65 Har. L. Rev. 234 con Pound, supra, 66 Harv. L. Rev. 28.

[9] Estamos conscientes de los peligros envueltos al atribuírsele un poder "inherente" a una rama del gobierno. "El peso acumulado por la repetición tras una frase tal como 'poderes inherentes' de las cortes Federales inferiores, es una invitación constante a pensar en palabras en vez de en cosas." Frankfurter y Landis, *Power of Congress Over Procedure in Criminal Contempts In "Inferior" Federal Courts—A Study in Separation of Powers,* 37 Harv. L. Rev. 1010, 1022–23. Sin embargo, esto no quiere decir que podemos desechar completamente el concepto de poder "inherente".

Por el contrario, muchos casos han resuelto que si en una situación específica la asamblea legislativa no provee procedimiento alguno, o provee un procedimiento inadecuado, los tribunales tienen la facultad inherente—y el deber—de establecerlo o complementarlo mediante reglas, siempre y cuando que éstas no sean inconsistentes con el estatuto. *Glenn* v. *McCarty*, 110 S.W.2d 1148, 1150 (Tex., 1937) ; *Byers* v. *Smith*, 47 P.2d 705 (Calif., 1935) ; *People* v. *Jordan*, 65 Cal. 644 (1884) ; *State* v. *Roy*, supra; Anotaciones, 110 A.L.R. 22, 27–8, 158 A.L.R. 705, 706; 3 Cal. Jur. 2d, págs. 384–5.([10]) Este Tribunal ha resuelto que existe una facultad análoga para llenar vacíos procesales mediante decisiones judiciales, a virtud de los artículos 7 del Código Civil y 36 del Código de Enjuiciamiento Civil. Véase el texto de esta opinión que precede al escolio 14, infra.

---

Los tribunales tienen facultad inherente a través del desacato civil para hacer cumplir sus sentencias bajo ciertas circunstancias a través de la sanción coercitiva de encarcelación indefinida. *Espinosa* v. *Ramírez, Alcaide de Cárcel*, 72 D.P.R. 901, y casos citados; *Espinosa* v. *Ramírez, Alcaide de Cárcel*, 71 D.P.R. 10; *Dubón* v. *Casanova*, 65 D.P.R. 835; *United States* v. *Mine Workers*, 330 U. S. 258. Tenemos también poder inherente para admitir y disciplinar miembros del foro; la legislación sobre esto sólo es directiva y no mandatoria. *In re Abella*, 67 D.P.R. 229, 238; *Ex parte Jiménez*, 55 D.P.R. 54. El entonces Juez Presidente Todd, declarando ante la Comisión de la Rama Judicial de la Convención Constituyente a nombre de este Tribunal, recomendó que no se insertara nada en el Artículo Judicial de la Constitución en relación a desacato civil y desafuero ya que éstas eran facultades inherentes a la judicatura. Transcripción de las Vistas Públicas ante la Comisión de la Rama Judicial de la Convención Constituyente, pág. 165. La Convención aceptó esta recomendación.

Al discutir esta cuestión, Rottschaefer en *Constitutional Law* dice a la pág. 52, escolio 31, que "El término 'inherentemente' debe sólo significar que el poder en cuestión fué incluído implícitamente en la concesión hecha por la constitución en la distribución de poderes gubernamentales, aunque a veces se usa para indicar que la facultad en cuestión necesariamente pertenece a un departamento independientemente de la concesión constitucional."

([10]) En *Glenn* v. *McCarty*, supra, la corte dijo a la pág. 1150: "Se ha resuelto en muchos casos que cuando un estatuto prescribe una regla de procedimiento, tal regla prescrita en el estatuto controlará. . . . Este tribunal ha reconocido repetidas veces que la Asamblea Legislativa tiene la facultad bajo la Constitución de aprobar reglas relacionadas con el derecho de apelación, y de modificar dichas reglas a su voluntad. Pero si la Asam-

■ Resta añadir solamente que en muchas ocasiones la facultad de adoptar reglas de procedimiento para todos los tribunales de un estado ha sido conferida a la corte de última instancia mediante disposiciones estatutarias más bien que constitucionales. Tales estatutos han sido atacados por constituir una indebida delegación de poder legislativo. En el campo del derecho sustantivo, los tribunales han declarado válidos estatutos que autorizan a agencias ejecutivas y administrativas a adoptar reglas que tengan fuerza de ley, *siempre y cuando que dichos estatutos fijen una norma o una política para la cual las reglas suplan los detalles.* *Hilton Hotels* v. *Junta de Salario Mínimo,* 74 D.P.R. 670, 693, y casos citados; *Godreau & Co.* v. *Com. Servicio Público,* 71 D.P.R. 649, 653; *Pueblo* v. *Rivera,* 67 D.P.R. 190, 192; *Luce & Co.* v. *Junta Salario Mínimo,* 62 D.P.R. 452; *Irizarry* v. *Corte,* 64 D.P.R. 94; *Secretary of Agriculture* v. *Central Roig Co.,* 338 U. S. 604; Schwartz, *A Decade of Administrative Law: 1942–1951,* 51 Mich. L. Rev. 775, 776–84. Pero en el campo del procedimiento, los estatutos que confieren a los tribunales facultades de promulgar reglas de procedimiento, han sido sostenidos por el peso abrumador de las autoridades, no obstante el hecho de que dichos estatutos no fijan tales normas y confieren a los tribunales amplio e ilimitado poder para adoptar reglas. El razonamiento que con más

---

blea Legislativa no ha dispuesto ningún procedimiento para la apelación de los casos, el Tribunal Supremo tiene autoridad para adoptar tales reglas con ese fin."

Pound, supra, 66 Harv. L. Rev. 28, 31, señala que en Nueva Jersey "Bajo el sistema preexistente el tribunal tenía facultad inherente para promulgar reglas de práctica y procedimiento sujetas a acción legislativa sobre los detalles." Y Peterfreund, supra, pág. 155, dice que "La facultad de los tribunales para promulgar y modificar reglas de procedimiento de hecho ha existido por siglos, pero, hasta nuestro siglo, se ha ejercitado raras veces en los Estados Unidos, *excepto como suplementaria a un grupo de reglas estatutarias.*" (Bastardillas nuestras.) Al mismo efecto, Vanderbilt indica en *Minimum Standards of Judicial Administration,* a las págs. 98–9, que "Bajo cualquiera fase de desarrollo los tribunales han retenido siempre autoridad para prescribir reglas complementarias de procedimiento cuando fuesen necesarias . . ." Véase también Pound, *Appellate Procedure in Civil Cases,* pág. 374.

frecuencia se ha empleado para no requerir que los estatutos que confieren a los tribunales la facultad de promulgar reglas, fijen normas en ellos, puede resumirse así: La facultad para proveer el procedimiento para los tribunales no es ni exclusivamente legislativa ni exclusivamente judicial, sino que puede ejercitarse por cualquiera de las dos ramas. En su consecuencia, el retiro de la asamblea legislativa del campo procesal no exige que ella fije normas para que los tribunales ejerciten un poder que éstos de antemano tienen concurrentemente con la asamblea legislativa. Dicho en otras palabras, tal estatuto no es una delegación inválida de poder legislativo, porque no es una concesión de poder propiamente dicha. *Kolkman* v. *People*, supra; *In re Constitutionality of Section 251.18, Wis. Statutes*, 236 N. W. 717 (Wis., 1931); *State* v. *Roy*, supra; *Petition of Florida State Bar Ass'n, Etc.*, 21 So.2d 605 (Fla., 1945); *State* v. *Superior Court*, 267 Pac. 770 (Wash., 1928); *Burney* v. *Lee*, 129 P.2d 308 (Ariz., 1942); *Wayman* v. *Southard*, 10 Wheat. 1, 6 L. ed. 253; Pound, supra, 66 Harv. L. Rev. 28, 33–4; Pound, *Regulation of Judicial Procedure by Rules of Court*, 10 Ill. L. Rev. 163, 170 *et seq.;* Rottschaefer en *Constitutional Law*, 52; Morgan, *Judicial Regulation of Court Procedure*, 2 Minn. L. Rev. 81, 91–6; Anotaciones, 110 A.L.R. 22, 38; 158 A.L.R. 705, 710. (11) Como veremos, la teoría bajo la cual estos

---

(11) En *Burney* v. *Lee*, supra, que trataba de un estatuto que confería al Tribunal Supremo la facultad de promulgar reglas, la corte dijo a la pág. 311 que ello "no era inconstitucional como una delegación no autorizada de poder legislativo, sino meramente la retirada de la asamblea legislativa del campo en el cual tenía a lo sumo meramente poder concurrente con los tribunales."

En *State* v. *Roy*, supra, la corte dijo a la pág. 660 que "Cuando la asamblea legislativa aprobó el capítulo 84 [concediendo al Tribunal Supremo la facultad de adoptar reglas de procedimiento para los tribunales] lo único que hizo fué retirarse de un campo en el cual hasta entonces había funcionado como una rama de igual rango de nuestro gobierno con el tribunal en la promulgación de reglas sobre las alegaciones, la práctica y el procedimiento. No es necesario determinar ahora si la rama legislativa del gobierno intervino correctamente en el campo de la promulgación de reglas, o si fué meramente una transgresora o usurpadora. El capítulo 84 no es una delegación de poder. Es una mera abdicación o retiro del

casos fueron resueltos juega un papel en el presente caso. ([12])

## II

### *Poder del Tribunal Supremo de Puerto Rico*
### *para Adoptar Reglas*

■■■ Desde el año 1900 hasta el 1952, la facultad para reglamentar el procedimiento en nuestros tribunales fué expresamente conferida a la Asamblea Legislativa como cuestión de derecho constitucional. Tanto el artículo 33 de la Ley Foraker como el artículo 40 de la Ley Jones disponían que "el procedimiento" en los tribunales continuaría como hasta entonces "hasta que otra cosa se disponga por ley . . ." 31 Stat. 77, 84; 39 Stat. 951, 965. Sin embargo, la Asamblea Legislativa desde el primer instante se desprendió un poco de este control absoluto sobre procedimiento conferídole por la Carta Orgánica. Dispuso que este Tribunal podría dictar reglamentos que no estuvieran en conflicto con las leyes de la isla "para su gobierno . . ." Y autorizó a las entonces cortes de distrito para hacer reglamentos para su gobierno siempre que éstos fuesen aprobados por el Procurador General. Artículo 8, Código de Enjuiciamiento Civil, ed. de 1933; véanse también la sección 4 de la Ley núm. 105, Leyes de Puerto Rico, 1925 y el artículo 34 de la Ley 432 de 1950, págs. 1127, 1143. Además, el Procurador General fué autorizado para establecer reglas para el procedimiento en los juicios por

campo de la promulgación de reglas. Es en efecto una renuncia a favor de los tribunales de la facultad de promulgar reglas." (Corchetes nuestros.)

([12]) Al sostener legislación de ambos tipos—estatutos autorizando reglamentos por parte del ejecutivo en cuanto a derecho sustantivo y estatutos confiriendo a los tribunales el poder de promulgar reglas procesales—los tribunales han rechazado casi universalmente el absolutismo doctrinario al aplicar la teoría de la separación de poderes a la tricotomía de la rama legislativa, la ejecutiva y la judicial. Han reconocido que las facultades de las tres ramas de gobierno a veces se traslapan y que la separación de poderes no es fórmula que pueda aplicarse con "precisión matemática" para "dividir las ramas en zonas impenetrables" (Opinión disidente del Juez Holmes en *Springer* v. *Philippine Islands*, 277 U. S. 189, 209, 211). Por el contrario, "Las exigencias del gobierno han requerido el relajamiento de la adhesión doctrinaria a un principio tan flexible y práctico, tan de aproximaciones prácticas, como lo es el de la separación de poderes." (El Juez Cardozo en *In re Richardson,* 160 N. E. 655, 657 (N. Y.,

jurado, siempre que las mismas no estuvieran en conflicto con la ley. Artículo 206, Código de Enjuiciamiento Criminal, ed. 1935.([13])

No obstante el requisito constitucional específico al efecto de que la Asamblea Legislativa fijará el procedimiento para los tribunales, las reglas que se han adoptado a tenor con el artículo 8 del Código de Enjuiciamiento Civil se han venido aplicando durante muchos años y, hasta donde sepamos, nunca han sido atacadas por constituir una indebida delegación de poder legislativo. *Cuevas Zequeira* v. *Hernández Usera*, 53 D.P.R. 923; *Rodríguez* v. *Morales*, 72 D.P.R. 35. Por el contrario, nuestra jurisprudencia ha reconocido aun

1928).) Como hemos señalado "no se puede afirmar con demasiado énfasis que las ramas gubernamentales están tan interrelacionadas en sus funciones como son independientes entre sí. En la frase de Madison, los poderes gubernamentales han sido mezclados en vez de separarse." *Banco Popular, Liquidador* v. *Corte*, 63 D.P.R. 66, 72. En resumen, "la separación de poderes no impide la acción conjunta de las tres ramas coordinadas e iguales del gobierno, que son tan dependientes entre sí como independientes". *Banco Popular, Liquidador* v. *Corte*, supra, pág. 78. En el presente caso tenemos "aun más otro ejemplo de la actuación gubernamental conjunta que expone claramente la estructura del gobierno como tupida telaraña." *Banco Popular, Liquidador* v. *Corte*, supra, pág. 86. Al mismo efecto, *Yakus* v. *United States*, 321 U. S. 414; *Youngstown Co.* v. *Sawyer*, 343 U. S. 579, opinión concurrente del Juez Jackson, pág. 634; *Winberry* v. *Salisbury*, supra, pág. 412; casos citados en el texto de esta opinión que antecede al escolio 11; Anotación, 79 L. ed. 475, 501; Mars, *The Constitutional Power of Congress Over the Administration of Federal Taxation*, 31 Taxes 503. Compárense Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees*, 66 Harv. L. Rev. 569; Jackson, *Presidential Legal Opinion*, 66 Harv. L. Rev. 1353; *Note, "Laying on the Table"—A Device for Legislative Control Over Delegated Powers*, 65 Harv. L. Rev. 637, 640.

Bajo la Ley Foraker había mucha más interrelación de los poderes ejecutivos y legislativos en el gobierno de Puerto Rico que bajo la Ley Jones. A los fines actuales, puede decirse que ésta encarnaba sustancialmente el mismo concepto de la separación de poderes que acabamos de describir y que se encuentra hoy en la Constitución del Estado Libre Asociado de Puerto Rico. *Buscaglia* v. *District Court of San Juan*, 145 F.2d 274 (C. A. 1, 1944); *González* v. *Corte*, 62 D.P.R. 160, 176; *Banco Popular, Liquidador* v. *Corte*, supra; *Cordero, Auditor* v. *Tribl. de Distrito*, 72 D.P.R. 378, 379.

([13]) La intervención del Procurador General fué de acuerdo con el artículo 14 del Acta Jones que lo puso a cargo de la administración de justicia en Puerto Rico. 39 Stat. 951, 956.

más poder a nuestros tribunales. En esta jurisdicción han surgido casos en que los apelantes no han cumplido con reglas o estatutos que exigían que el récord en apelación sea radicado ante el tribunal de apelación dentro de determinado período. Hemos resuelto que el tribunal de apelación tiene autoridad para desestimar la apelación bajo tales circunstancias, a pesar de la falta de una disposición en las reglas o en la ley confiriéndole tal autoridad. Al así resolverlo, hemos descansado en el artículo 7 del Código Civil, ed. de 1930, y en el artículo 6 del Código de Enjuiciamiento Civil, ed. 1933.[14] *Batista* v. *Rivera et al.*, 25 D.P.R. 169; *Cividanes* v. *López Acosta*, 22 D.P.R. 79; *López Zárate* v. *Villavaso*, 12 D.P.R. 53; Dainow, *The Method of Legal Development Through Judicial Interpretation in Louisiana and Puerto Rico*, XXII Revista Jurídica de la Universidad de Puerto Rico 108, 141.

De igual modo, en *Bermúdez* v. *Registrador*, 70 D.P.R. 834, resolvimos que, en vista de que el Código de Enjuiciamiento Civil y las Reglas de Enjuiciamiento Civil nada disponen en cuanto al procedimiento a seguir para la citación por edictos de demandados desconocidos, los tribunales pueden adoptar un procedimiento adecuado para la misma a tenor con el artículo 36 del Código de Enjuiciamiento Civil. La Corte de Apelaciones para el Primer Circuito expresó un criterio similar. Indicó que, no obstante el completo control sobre procedimiento conferido a la Asamblea Legislativa por

---

[14] El artículo 7 del Código Civil lee como sigue: "El tribunal que rehuse fallar a pretexto de silencio, obscuridad o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.

"Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

El artículo 36 del Código de Enjuiciamiento Civil lee como sigue: "Cuando por este Código o por otra ley se confiera jurisdicción a una corte o funcionario judicial, se le confieren también todos los medios necesarios para hacerla efectiva; y en el ejercicio de ella, si el procedimiento no estuviere especialmente señalado en este Código o en otra ley, podrá adoptarse cualquier otro procedimiento o modo adecuado que parezca estar más en armonía con el espíritu de este Código."

el artículo 40 de la Carta Orgánica, el Congreso por dicho artículo "meramente tuvo por miras proveer un procedimiento básico que, dentro de los límites constitucionales y estatutarios, los tribunales insulares, como los tribunales que administran el derecho común, pudieran desarrollar como creyeren más conveniente." *Mercado Riera* v. *Mercado Riera*, 152 F.2d 86, 93 (C. A. 1, 1945). Así vemos que en Puerto Rico a los tribunales no solamente se les dió por estatuto cierta facultad, aunque un tanto limitada, para promulgar reglas, si que también se les autorizó por el artículo 7 del Código Civil y el artículo 36 del Código de Enjuiciamiento Civil para llenar vacíos en tales reglas y estatutos procesales mediante decisiones judiciales. *Gral. Motors Acceptance* v. *Tribl. de Distrito*, 70 D.P.R. 941, 945 (en moción de reconsideración).[15]

Siguiendo la tendencia que hemos descrito en la Parte I en el sistema Federal y en un número de estados, la Ley núm. 9, Leyes de Puerto Rico, 1941 ((1) pág. 331), autorizó a este Tribunal a adoptar reglas de procedimiento para todos los tribunales de Puerto Rico. La sección 1 disponía que las reglas serían remitidas "a la Asamblea Legislativa en su próxima sesión ordinaria y no comenzarán a regir hasta la clausura de dicha sesión." La sección 3 provee que toda ley anterior sobre procedimiento se considerará como regla de la Corte Suprema y continuará en vigor como tal, a menos que sea modificada o derogada por reglas promulgadas a virtud de la Ley núm. 9.

Ejercitamos la autoridad conferídanos por la Ley núm. 9, promulgando 86 reglas, copiadas sustancialmente de las Reglas Federales y conocidas como "Reglas de Enjuiciamiento Civil". Las Reglas, que aparecen al final del Tomo 60 de las Decisiones de Puerto Rico, fueron remitidas a la Asamblea

---

[15] *Cf. Rodríguez* v. *Morales*, supra, 39, donde dijimos que la Regla 3 de las Reglas para las Cortes de Distrito "no es otra cosa que una reglamentación del ejercicio del poder *inherente* de los tribunales para ordenar el archivo de una acción por falta de gestión ..." (Bastardillas nuestras.)

Legislativa, la cual no tomó acción alguna sobre las mismas. Como resultado de ello, empezaron a regir el 1 de septiembre ·de 1943. Varias disposiciones del Código de Enjuiciamiento Civil y de otras leyes fueron suplantadas por las Reglas. *Autoridad de Fuentes Fluviales* v. *Corte*, 65 D.P.R. 480. Por otro lado, el Código de Enjuiciamiento Civil ha quedado en vigor para ciertas clases de procedimientos y para aquellas cuestiones no comprendidas en las Reglas. *Real Estate Corporation* v. *Junta de Planificación*, 74 D.P.R. 470; *Martínez Fernández & Cía.* v. *García*, 68 D.P.R. 391; *García* v. *Central Alianza*, 65 D.P.R. 133. ([16])

La Ley núm. 25, Leyes de Puerto Rico, 1948 ((1) pág. 51) retiró de este Tribunal el poder de adoptar reglas. A su vez y en virtud de su artículo 1 la Corte Suprema quedó "facultada para redactar y proponer" a la Asamblea Legislativa reglas para los procedimientos judiciales, las cuales empezarían a regir solamente si la Asamblea Legislativa las aprobase afirmativamente. Las Reglas de Enjuiciamiento Civil, que empezaron a regir en 1943, fueron continuadas en vigor por el artículo 2 "hasta que sean modificadas, enmendadas o derogadas por la Asamblea Legislativa". Por razones obvias, este Tribunal no ha propuesto reglas adicionales en este nuevo rol de agencia redactora para la Asamblea Legislativa.

La sección 6 del Artículo V de la Constitución rescató el poder de este Tribunal de adoptar reglas del nivel a que lo bajó la Ley núm. 25 de 1948. ([17]) En su informe a la Convención Constituyente, la Comisión de la Rama Judicial ex-

([16]) El artículo 33 del Acta Foraker y el artículo 40 del Acta Jones, como hemos visto, disponían específicamente como cuestión de ley constitucional que la Asamblea Legislativa reglamentaría el procedimiento de nuestros tribunales. Y la Ley núm. 9 de 1941 no dispuso norma alguna al delegar en nosotros el poder de adoptar reglas de procedimiento. Sin embargo, nuestras Reglas de Enjuiciamiento Civil jamás han sido atacadas como una delegación inválida de poder legislativo. Ni se ha alegado que las Reglas, siendo de hecho legislación, deberían haber sido sometidas al Congreso bajo el artículo 23 del Acta Orgánica. *Cf. Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 15, escolio 17.

([17]) La sección 6 se cita en el escolio 2.

puso sus comentarios sobre la sección 8 del Artículo sobre la Rama Judicial que recomendaba a la Convención. La sección 8 luego pasó a ser la sección 6 en el texto final del Artículo sobre la Rama Judicial según fué adoptado por la Constituyente. La sección 6 fué adoptada por la Convención Constituyente con excepción de una pequeña enmienda que no es relevante aquí. El comentario de la Comisión fué así:

"La Comisión recomienda elevar a categoría constitucional la facultad del Tribunal Supremo para adoptar reglas de procedimiento. Tal facultad le ha sido ya conferida al Tribunal Supremo, en distintas formas, desde el 1941. Quince estados de la Unión Americana conceden a su Tribunal Supremo esta facultad, *la que se considera como función propia del Poder Judicial.*

"En cuanto a facultar al poder legislativo para enmendar, suplementar o derogar en cualquier tiempo, cualquiera de dichas reglas mediante ley específica limitada a tal efecto, esta sección sigue lo dispuesto en las constituciones de Missouri, South Dakota, Wisconsin y Filipinas. La Constitución modelo propuesta por la National Municipal League, contiene también una disposición similar a la que se recomienda.

"La Comisión desea hacer claro que el poder que para hacer reglas de procedimiento se concede al Tribunal Supremo, no conlleva en forma alguna el poder de modificar o alterar, a virtud de esas reglas, derechos sustantivos.

"Véase: Vanderbilt, *Minimum Standards of Judicial Administration, 1949,* págs. 91, 142; Pirsig, *Cases and Materials on Judicial Administration,* pág. 968." (Bastardillas nuestras.)

Es significativo el hecho de que Vanderbilt, supra, pág. 91, en que se basa la Comisión en su informe, dice que "la reglamentación del procedimiento mediante reglas del tribunal no es una innovación, sino un retorno a principios fundamentales." Esto indudablemente fué también lo que la Comisión tuvo en mente cuando llamó a la facultad de promulgar reglas una "función propia del Poder Judicial". El Presidente de la Comisión de la Rama Judicial, Hon. Ernesto Ramos Antonini, expresó el mismo pensamiento en su lúcida explicación

de esta sección a la Constituyente. Dijo a la pág. 172 del Diario de Sesiones, Convención Constituyente de Puerto Rico:

"Actualmente, hay un asomo de ese propósito en la legislación vigente, pero podría muy bien cambiarse en cualquier momento y privar de toda facultad al Tribunal Supremo para aprobar tales reglas. Lo que hacemos es elevar a rango constitucional el procedimiento, que en alguna otra forma ha existido desde los últimos años en nuestra legislación, de manera que sea el propio poder judicial el que adopte las reglas de procedimiento.

"Bien es cierto que se conserve al poder legislativo la facultad de enmendar o derogar o suplementar las reglas adoptadas por el Tribunal Supremo, como asimismo también el Tribunal Supremo viene obligado a someter, al comienzo de cada sesión ordinaria o de la que sea, las reglas que haya adoptado y éstas no regirán hasta cerrarse la sesión. Esto tiende a crear, de momento y de manera saludable, lo que pudiera llamarse el sistema de contra-peso entre el poder legislativo y el judicial con el ejecutivo también, pero ciertamente al dársele la iniciativa y la facultad al Tribunal Supremo en relación con el cuerpo de reglas, en general, estamos convencidos de que se desarrollará, en el curso del tiempo, un clímax [clima ?] en el sentido de aprobación de reglas, mediante el cual será muy de tarde en tarde que la Legislatura de Puerto Rico tendrá necesidad de, en alguna forma, por vía de enmienda, derogación o suplementación realizar la función de aprobación de reglas de procedimiento, *que desde tiempo inmemorial ha sido un poder inherente del poder judicial, a través de la historia en todo el mundo."* (Bastardillas nuestras.)

La manifestación del distinguido Presidente de la Comisión de la Rama Judicial al efecto de que los tribunales tienen poder inherente para adoptar sus propias reglas de procedimiento, debe leerse en su contexto y a la luz de los términos de la sección 6 del Artículo V. Convenimos en que él no quiso decir que esta facultad era inherente al punto de que la Asamblea Legislativa quedaba totalmente excluída del campo procesal. Aparentemente el Presidente pensaba en este poder inherente en sentido más limitado, precisamente porque la sección 6, que él recomendaba, confiere a la Asamblea Legislativa un rol, con algunas limitaciones, en este campo: Una

vez que este Tribunal ha tomado la iniciativa y ha sometido reglas a la Asamblea Legislativa, ésta puede enmendarlas, derogarlas o complementarlas, siempre y cuando apruebe una ley específica a tal efecto.[18] Pero a nuestros fines es importante tener en cuenta que el Presidente reconoció que la adopción de reglas procesales es básicamente inherente a los tribunales.

Durante el debate ante la Constituyente nadie objetó este concepto.[19] Y las autoridades en que la Comisión descansó en su Informe y la historia del procedimiento que hemos expuesto en la Parte I lo apoyan. Las disposiciones de la sección 8, la descripción de su *modus operandi*, y la caracterización de la promulgación de reglas como inherente a los tribunales, todas demuestran que dicha facultad fué establecida en la Constitución primariamente como un poder judicial más bien que legislativo.

Es cierto, según dijo el Presidente, que la sección 8 contiene una cláusula que opera como freno potencial sobre los tribunales por la Asamblea Legislativa. Pero, como indica, dicha disposición debe invocarse por la Asamblea Legislativa en raras ocasiones y sólo por motivos poderosos. La iniciativa debe partir de este Tribunal; el deber y la responsabilidad primarios descansan sobre nosotros; y de dársele algún cálificativo a esta facultad, el mismo debe ser el de judicial más bien que el de legislativo.[20]

---

[18] El Delegado Gutiérrez Franqui, hábil abogado que fué Vicepresidente de la Convención además de Procurador General en aquella fecha, dijo durante el debate que las disposiciones referentes al procedimiento bajo la sección 6 "tendrían que originarse en el Tribunal Supremo". Diario de Sesiones, supra, pág. 629.

[19] El Delegado Reyes Delgado, también un prominente abogado de vasta experiencia, abogó porque se eliminara de la sección 6 el poder de adoptar reglas de evidencia. Prefería conferir esa función específica exclusivamente a la Asamblea Legislativa. Pero en cuanto a procedimiento, aún él indicó que "El poder de hacer reglas de procedimiento ha sido inherente en los tribunales . . .". Diario de Sesiones, supra, pág. 629.

[20] Ya hemos señalado la inutilidad de tratar de establecer clasificaciones inflexibles bajo la doctrina de la separación de poderes. Véase el escolio

### III

*Mediante la Sección 19 de la Ley de la Judicatura la Asamblea Legislativa autorizó a este Tribunal a promulgar Reglas para el Procedimiento de Apelación del Tribunal de Distrito al Tribunal Superior sin necesidad de remitir dichas Reglas a . la Asamblea Legislativa*

El Congreso aprobó la Constitución del Estado Libre Asociado de Puerto Rico el 3 de julio de 1952. 66 Stat. 327. La Constitución empezó a regir, a tenor con la proclama del Gobernador, el 25 de julio de 1952. Durante este período de tres semanas, Puerto Rico estaba en el umbral de una nueva era en su historia constitucional. No es éste el sitio de enunciar las más amplias implicaciones jurídicas y constitucionales de la Constitución. *Cf. Mora v. Torres*, 113 F.Supp. 309 (Dist. Ct., Puerto Rico, 1953), confirmado en *Mora v. Mejías*, 206 F.2d 377 (C. A. 1, 1953) ; Magruder, *The Commonwealth Status of Puerto Rico*, 15 U. of Pittsburgh L. Rev. 1 ; Gutiérrez Franqui y Wells, *The Commonwealth Constitution*, 285 *The Annals, American Academy of Political Science*, 33, 34, 40; *Comment, Self–Determination: The New Puerto Rico Formula*, 2 *American Journal of Comparative Law* 54. Pero no podemos hacer caso omiso del hecho de que fué necesario que la Asamblea Legislativa, durante el corto período transcurrido desde el 3 al 25 de julio de 1952, llevará a efecto la urgente y difícil tarea de ajustar el funcionamiento de nuestro gobierno a la nueva Constitución. Un importante problema era la necesidad de una Ley de la Judicatura que complementara la estructura establecida en el Artículo de la Rama Judicial de la Constitución.

La Constitución efectuó un número de cambios fundamentales en nuestro sistema judicial. Al comienzo mismo, en la sección 2 del Artículo I de la Constitución, lo judicial fué establecido como una rama del gobierno, *igual* a la rama eje-

---

12. Pero ello no disminuye la importancia en este caso en particular del concepto de que el poder de adoptar reglas de procedimiento es básicamente judicial más bien que legislativo.

cutiva y a la legislativa.[21] Las disposiciones del Artículo sobre la Rama Judicial fueron redactadas en forma tal que aseguraran a la comunidad una judicatura independiente que operara un sistema judicial moderno y eficiente y que decidiera prontamente los casos sobre los méritos más bien que sobre cuestiones técnicas de procedimiento y jurisdicción. *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, 86–98.

El término del cargo de los jueces fué asegurado a tenor con las secciones 8, 13 y 3 del Artículo V. Se requiere un sistema de retiro para los jueces bajo la sección 10 del Artículo V. Los sueldos de los jueces no pueden ser disminuídos durante el término para el cual fueron nombrados, de conformidad con la sección 11 del Artículo VI. A virtud de la sección 12 los jueces no pueden participar en campañas políticas. Bajo la sección 11, los jueces de tribunales sentenciadores podrán ser destituídos solamente por el Tribunal Supremo en vez de, como en el pasado, por el Gobernador. La administración de los tribunales, que anteriormente era de la incumbencia del Procurador General, de conformidad con la Carta Orgánica, 39 Stat. 951, 956, fué transferida por la sección 7 al Juez Presidente; las reglas de administración serían adoptadas por el Tribunal Supremo sin tener que remitirlas a las ramas legislativa o ejecutiva del gobierno.[22] La sección 2 creó un sistema judicial unificado a los fines de jurisdicción y administración. Y la sección 6 confirió a este Tribunal facultad para adoptar reglas de procedimiento y de evidencia.

Obviamente era imprescindible que la Asamblea Legislativa aprobara, en el corto período de tres semanas, una nueva

[21] La sección 2 del Artículo I lee como sigue: "El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán *igualmente* subordinados a la soberanía del pueblo de Puerto Rico." (Bastardillas nuestras.)

[22] La sección 7 dispone que las reglas de administración "estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y otras leyes aplicables en general al gobierno."

Ley de la Judicatura, que empezara a regir inmediatamente, complementando estos cambios. Así se hizo mediante la Ley núm. 11 de 1952 ((2) pág. 31). Por ejemplo, el concepto de un sistema judicial unificado a los fines de jurisdicción que aparece en la sección 2 del Artículo V, está comprendido en detalle en la sección 10 de la Ley núm. 11, que empezó a regir inmediatamente. El resultado—la eliminación de las consecuencias fatales que surgían de los problemas de jurisdicción sobre la materia en nuestros tribunales sentenciadores— es uno de los logros más notables de nuestro nuevo sistema judicial. *Rodríguez* v. *Registrador*, pág. 712 de este Tomo.

Al transferir la administración de los tribunales del Procurador General al Juez Presidente y al Tribunal Supremo, la sección 7 del Artículo sobre la Rama Judicial dió un gran paso de avance hacia una judicatura independiente. Se requerían disposiciones en detalle para llevar a efecto este nuevo principio de administración de los tribunales. Éstas se encuentran en la Ley de la Judicatura y también entraron en vigor inmediatamente. Las mismas incluyen disposiciones para la asignación de jueces dentro del Tribunal de Primera Instancia, para aumento en el número de jueces, para procedimiento para la destitución de jueces, para nombramiento del personal subalterno, para la conservación de expedientes y para las funciones de la Oficina de Administración de los Tribunales. Secciones 3, 4, 8, 15, 24–29, de la Ley núm. 11 de 1952.([23])

---

([23]) Shelden Elliot, Director del Instituto de Administración Judicial, dice lo siguiente sobre nuestra Ley de la Judicatura: "Con respecto a las reorganizaciones llevadas a cabo, y llevadas a cabo en este caso en un espacio de tiempo extraordinariamente corto, la Ley de la Judicatura de Puerto Rico de 1952 es un logro notable. Complementando el Artículo de la Rama Judicial de la nueva Constitución de la isla, la ley provee un sistema unificado e integrado para los tribunales, confiere al Juez Presidente plena facultad para supervisar las funciones de los tribunales y asignar jueces, y dispone para un director administrativo y para una oficina de administración de cortes. La Constitución autoriza al Tribunal Supremo a adoptar reglas de evidencia y de procedimiento así como reglas para la administración de los tribunales." *1952 Annual Survey of American Law* 780.

Otra gran reforma fué establecida en la sección 19 de la Ley de la Judicatura. Clark y Rogers, supra, 61 Yale L. J. 1147, 1161, se refieren a la misma como "quizás con toda probabilidad la reforma de más importancia" en nuestro nuevo sistema judicial. Por la sección 19 el juicio *de novo* en apelación del Tribunal de Distrito al Tribunal Superior fué expresamente descartado. Fué sustituído por una revisión solamente a base del récord ante el Tribunal de Distrito. [24] La teoría de la Asamblea Legislativa fué que sustituyendo el indefinible e inútil juicio *de novo* por una apelación sobre el récord sería más justo y eficiente, estaría más en armonía con la unificación del sistema judicial bajo la cual el Tribunal

---

[24] La sección 19 lee como sigue:

"*Apelaciones.* Por la presente se establece el derecho a apelar al Tribunal Superior de cualquier sentencia final del Tribunal de Distrito. El procedimiento de apelación se seguirá a tenor con las reglas promulgadas por el Tribunal Supremo. La vista y decisión de tales apelaciones tendrán lugar ante tres jueces del Tribunal Superior o ante uno solo de ellos, según por regla establezca el Tribunal Supremo, de conformidad con la naturaleza del caso o la cuantía envuelta o con cualquier otra norma razonable a su discreción; y el Juez Presidente podrá asignar la vista de los casos bajo tal regla, cuando haya dudas o desacuerdo entre las partes. Una ulterior revisión sólo podrá lograrse mediante certiorari ante el Tribunal Supremo, a ser librado por dicho Tribunal a su discreción.

"La apelación se hará por vía de revisión de la sentencia o actuación del tribunal de que se apele; y no mediante juicio *de novo.*

"En todo caso el Juez proveerá un récord de todo lo ocurrido en el caso que será unido al expediente del mismo, a menos que la parte o las partes puedan preparar una transcripción de evidencia. Las partes deberán comunicarle al Juez dentro del término que se especifique por regla del Tribunal Supremo cualquier objeción que tengan tanto al récord del caso preparado por el Juez, como a la transcripción de la evidencia. El Juez oirá y resolverá las objeciones. El Tribunal Supremo también reglamentará la concesión de nuevas vistas por el Tribunal de Distrito, al solicitársele prontamente, en aquellos casos en que las partes o sus abogados no hayan protegido adecuadamente sus derechos durante el juicio original de un caso o no se haya provisto un récord adecuado por el Juez.

"La oficina del Administrador de Tribunales proveerá a cada sala del Tribunal de Distrito de un equipo adecuado para grabar las incidencias de cada caso. El juez podrá utilizar esta grabación al preparar la relación de lo ocurrido durante el juicio y la misma deberá ser elevada al Tribunal Superior con el legajo de la sentencia cuando así lo solicite cualquiera de las partes. El Tribunal Superior cuando se alegue que la relación preparada por el juez de distrito es incorrecta, utilizará la grabación para resolver la apelación o para ordenar un nuevo juicio en el Tribunal de Distrito."

612

de Primera Instancia, a tenor con la sección 9 de la Ley de la Judicatura, consiste de dos divisiones y no de tribunales inflexiblemente separados, y realzaría el prestigio y la dignidad de los anteriores jueces municipales. Clark y Rogers, supra, 61 Yale L. J. 1147, 1161-5.([25])

Contrario a todas las otras disposiciones de la Ley de la Judicatura, la Asamblea Legislativa decidió que no era conveniente conferirle vigencia inmediata al cambio en el sistema de las apelaciones del Tribunal de Distrito al Tribunal Superior. La sección 37 pospuso la fecha de vigencia del nuevo sistema hasta el 15 de octubre de 1952.([26]) Quizás la razón primordial para disponer en la sección 37 la posposición, para este único fin, de la fecha de vigencia de la sección 19 de la Ley de la Judicatura hasta el 15 de octubre de 1952, fué concederle al Director Administrativo de los Tribunales tiempo suficiente para comprar las máquinas grabadoras a ser usadas en el Tribunal de Distrito, el cual por primera vez pasaba a ser un verdadero tribunal de récord. Actas de la Cámara de Representantes de Puerto Rico, 1952, pág. 476; Clark y Rogers, supra, 61 Yale L. J. 1147, 1164, escolio 61.([27])

Sin embargo, el problema de comprar máquinas grabadoras no fué el único motivo para posponer hasta el 15 de

([25]) Bajo el antiguo sistema de apelación de la Corte Municipal el término "apelación" era un calificativo erróneo; la corte de "apelación", la antigua corte de distrito, celebraba un juicio sobre los hechos enteramente nuevo y dictaba su propia sentencia nueva. *Pagán* v. *Quiñones et al.,* 13 D.P.R. 317; *Gelabert Hermanos* v. *Córdova,* 17 D.P.R. 1200; *Fradera* v. *Morales et al.,* 19 D.P.R. 1122; *Cividanes* v. *López Acosta,* supra; *Pueblo* v. *Romero,* 39 D.P.R. 557; *Fernández* v. *Orcasitas,* 51 D.P.R. 304. *Cf.* sección 39 de la Ley núm. 432, Leyes de Puerto Rico, 1950 ((1) pág. 1127).

([26]) La sección 37 lee como sigue: "Esta Ley, por ser de carácter urgente y necesaria, empezará a regir al entrar en vigor la Constitución del Estado Libre Asociado de Puerto Rico, con excepción de la Sección 19 que entrará en vigor el 15 de octubre de 1952. Mientras tanto, para apelar del Tribunal de Distrito al Tribunal Superior prevalecerá el procedimiento para apelar del antiguo Tribunal Municipal al anterior Tribunal de Distrito vigente a la fecha de aprobación de esta Ley."

([27]) El escolio 61 lee como sigue: "Con el fin de disponer de tiempo para suplir a los varios tribunales con alrededor de cincuenta y cinco máquinas, la Asamblea Legislativa pospuso la vigencia de esta sección hasta

octubre de 1952 la fecha de vigencia del nuevo método de revisión en apelación de las sentencias del Tribunal de Distrito. Un segundo motivo, más importante a nuestros fines, fué que la Asamblea Legislativa estableció en la sección 19 algún procedimiento pero no todo el que obviamente era necesario para el nuevo método de revisión, que había sustituído el juicio *de novo* por una verdadera revisión en apelación. Se nos confirió la facultad en la sección 19 de promulgar el resto de las reglas de procedimiento necesarias para tales apelaciones. Pero la Asamblea Legislativa se dió cuenta de que este Tribunal no podía adoptar tales reglas de procedimiento de la noche a la mañana. En su consecuencia, en la sección 37 pospuso la fecha de vigencia del nuevo método hasta el 15 de octubre, un período de aproximadamente tres meses. Durante este período la Asamblea Legislativa esperaba que ambos problemas—el de la adquisición de las máquinas grabadoras y el de la promulgación de las reglas de procedimiento por este Tribunal—estuvieran resueltos.

La Asamblea Legislativa dijo inequívoca e incondicionalmente en la sección 37 que las apelaciones se tramitarían únicamente a base del récord *a partir del 15 de octubre de 1952.*([28]) Pero la Asamblea Legislativa tenía conocimiento de dos hechos: (1) el nuevo método de revisión no podía funcionar sin un número de cambios en el procedimiento de apelación; (2) las reglas que comprenderían estos cambios no podían ser sometidas por este Tribunal al comienzo de la próxima sesión ordinaria de la Asamblea Legislativa el 12 de enero de 1953, si las mismas tenían que empezar a regir antes, o sea, el 15 de octubre de 1952. Es obvio que, al proveer que el nuevo método de revisión empezaría a regir el 15

---

el 15 de octubre de 1952; mientras tanto las apelaciones del tribunal inferior seguirían el procedimiento anterior. El resto de la Ley entró en vigor junto con la Constitución, v. g., el 25 de julio de 1952."

([28]) El derecho de apelación es estatutario. Las condiciones de tal derecho, incluyendo el alcance de la revisión por la corte de apelación, deberán ser determinadas por la Asamblea Legislativa. Y el apelante debe cumplir estrictamente con las mismas en la tramitación de su apelación. *Ponce* v. *F. Badrena e Hijos, Inc.,* 74 D.P.R. 225, 249, escolio 6.

de octubre de 1952, la Asamblea Legislativa tuvo por miras que las Reglas promulgadas por nosotros entraran en vigor el 15 de octubre de 1952 sin ser remitidas a la Asamblea Legislativa al comienzo de su próxima sesión ordinaria.[29]

El acusado arguye que la sección 2 de la Ley de la Judicatura disponía en forma mandatoria el que este Tribunal remitiera las Reglas para las Apelaciones del Tribunal de Distrito al Tribunal Superior a la Asamblea Legislativa antes de que las mismas empezaran a regir.[30] No estamos conformes. La sección 2 es una mera reiteración en términos generales de la concesión constitucional del poder de adoptar reglas. Así la caracteriza el Juez Clark en su artículo sobre nuestra Ley. Clark y Rogers, supra, 61 Yale L. J. 1147, 1167. Tal reiteración es un método frecuente y familiar. Cumple el útil propósito de aunar en un solo documento las importantes disposiciones constitucionales y estatutarias con respecto a la judicatura. Hay varios otros ejemplos de estas disposiciones repetidas en la Ley de la Judicatura que anotamos en la nota al calce.[31] La sección 2 y estas otras disposiciones duplicadas nada añaden a las disposiciones de la

---

[29] La sección 32 de la Ley núm. 11 dispone que a todo caso pendiente en apelación de la anterior corte municipal ante el tribunal de distrito "le será concedida una apelación ante el Tribunal Superior con juicio *de novo* a tenor con la ley anterior." Esto confirma nuestro criterio de que bajo las secciones 19 y 37 regirá un método nuevo de apelación por el récord desde el 15 de octubre de 1952 en todo caso que no estuviere entonces pendiente en apelación procedente de la anterior corte municipal.

[30] La sección 2 lee en parte como sigue: *"Reglas—Facultad para Adoptarlas.*—El Tribunal Supremo adoptará para el Tribunal General de Justicia reglas de evidencia y de procedimiento civil y criminal, así como reglas para la administración de los tribunales, de conformidad con lo provisto por la Constitución del Estado Libre Asociado. Las reglas de administración estarán sujetas a las leyes relativas a suministros, personal, fiscalización y asignación de fondos, y a otras leyes aplicables en general a todas las ramas del gobierno. Toda disposición estatutaria o de reglamentación existente en la actualidad, sobre procedimiento civil y criminal y de evidencia, permanecerá en vigor hasta que la misma sea modificada, suplementada o enmendada por el Tribunal Supremo de acuerdo con la Constitución del Estado Libre Asociado de Puerto Rico."

[31] La sección 1 de la Ley de la Judicatura expone de nuevo la disposición de la Sección 2 del Artículo V de la Constitución estableciendo un sis-

Constitución. Como ya se ha indicado, las mismas fueron incluídas con el único fin de agrupar en un solo sitio los aspectos más sobresalientes de nuestro sistema judicial. Por consiguiente, la sección 2 no juega papel alguno en este caso.

Es cierto que la tercera oración de la sección 2 dispone que toda disposición estatutaria o de reglamentación existente entonces, permanecería en vigor hasta que la misma fuese modificada por nosotros *de acuerdo con la Constitución*. Pero era superfluo disponer que todas las leyes y reglamentos existentes permanecerían en vigor hasta que fuesen modificados. Esto ya era cierto no solamente por implicación, si que también bajo los términos expresos de la Sección 1 del Artículo IX de la Constitución.([32]) Más aún, al disponer que tales leyes y reglamentos permanecerían en vigor hasta que los mismos fuesen modificados *de acuerdo con la Constitución*, la tercera oración de la sección 2 únicamente reexponía una vez más la norma establecida en la primera oración de dicha sección, que de por sí, como hemos visto, era una mera reiteración de la Sección 6 del Artículo V de la Constitución. En resumen, la Asamblea Legislativa, en estas dos reiteraciones generales de nuestra facultad para promulgar reglas halladas en la sección 2, no enfocaba la limitada cuestión que pende ante nos ahora. Dejó dicho problema a la sección 19, que cubre específicamente el presente caso. Y la sección 19, por los motivos

tema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. La sección 3 hace al Juez Presidente el administrador de los tribunales, tal y como dispone la Sección 7 del Artículo V. La sección 5, que dispone el número de Jueces de este Tribunal y la manera de oír y resolver los casos, es idéntica a las Secciones 3 y 4 del Artículo V. La sección 7 reitera nuestra jurisdicción original, tal como se encuentra en la Sección 5 del Artículo V. Esto es también cierto en parte en cuanto a la sección 24, que dispone el procedimiento para la destitución de los jueces, comparada con la Sección 11 del Artículo V. La sección 25 provee para el cargo de y fija el procedimiento para nombrar al Director Administrativo de los Tribunales en el mismo lenguaje usado en la Sección 7 del Artículo V.

([32]) La sección 1 del Artículo IX dispone en parte que "Al comenzar a regir esta Constitución todas las leyes que no estén en conflicto con la misma continuarán en vigor íntegramente hasta que sean enmendadas o derogadas o hasta que cese su vigencia de acuerdo con sus propias disposiciones."

ya expuestos, dispone que las reglas promulgadas a tenor con la misma no seguirán el curso establecido por la sección 6 del Artículo V de la Constitución.

A la luz de lo anterior, concluímos que la sección 19 de la Ley de la Judicatura autorizó a este Tribunal para adoptar reglas de procedimiento para las apelaciones del Tribunal de Distrito al Tribunal Superior sin tener que remitirlas a la Asamblea Legislativa.

## IV

*La sección 19 de la Ley de la Judicatura válidamente proveyó algún procedimiento y válidamente nos autorizó para que adoptásemos el resto de las reglas necesarias para el procedimiento en apelación del Tribunal de Distrito al Tribunal Superior, sin remitirlas a la Asamblea Legislativa, no empece las disposiciones de la Sección 6 del artículo V de la Constitución*

 El Tribunal Superior resolvió que la Sección 6 del Artículo V de la Constitución solamente es aplicable a reglas referentes al juicio de un caso; que la apelación no forma parte del juicio; y que por tanto el requisito o la limitación hallada en la sección 6 del Artículo V de previa remisión a la Asamblea Legislativa no se aplica a las reglas de procedimiento en apelación. El tribunal sentenciador añadió que la apelación es un derecho estatutario, no constitucional; que existe solamente en la forma provista por la Asamblea Legislativa, y que habiendo provisto la Asamblea Legislativa en la sección 19 que este Tribunal promulgará el procedimiento en apelación del Tribunal de Distrito al Tribunal Superior sin previa sumisión a la Asamblea Legislativa, tales apelaciones pueden llevarse a cabo solamente de conformidad con las reglas que hemos promulgado.

No podemos convenir con la premisa sentada por el Tribunal Superior al efecto de que la Sección 6 del Artículo V no se aplica a apelaciones. Esta cuestión ha surgido en

el sistema Federal precisamente porque el Estatuto de Autorización del Congreso facultó al Tribunal Supremo para promulgar reglas de procedimiento "de las cortes de distrito de los Estados Unidos . . ." 28 U.S.C. sec. 2072. Al adoptar las reglas federales, este problema fué resuelto descansando en el Estatuto de Autorización únicamente para aquellas partes del procedimiento en apelación que comprendían los pasos a darse en la corte de distrito. Se incluyeron ciertas otras reglas en relación con el procedimiento en apelación propiamente dicho; pero la autoridad para promulgarlas se atribuía a otros estatutos generales de autorización. Clark, *Power of the Supreme Court to Make Rules of Appellate Procedure*, 49 Harv. L. Rev. 1303; Clark, *Experience under the Amendments to the Rules*, 1, 30–35, 1953 Federal Rules of Civil Procedure; *Lopinsky* v. *Hertz Drive-ur-self Systems*, 194 F.2d 422, 424 (C. A. 2, 1951), opinión concurrente del Juez Clark.

La diferencia entre nuestra disposición constitucional y el estatuto federal es que en la Sección 6 del Artículo V no existe una frase restrictiva como lo es la de procedimiento "de las cortes de distrito". Por el contrario, la sección 6 dice en forma abarcadora que este Tribunal adoptará "para los tribunales" reglas de evidencia y de procedimiento civil y criminal. Esto fué de conformidad con el concepto de "un sistema judicial unificado" y la adopción por este Tribunal de reglas de administración para todos los tribunales. Secciones 2 y 7 del Artículo V. Por tanto, no podemos convenir en que nuestro poder para adoptar las reglas de procedimiento en apelación del Tribunal de Distrito al Tribunal Superior descansa únicamente en la base estatutaria de la sección 19 de la Ley núm. 11 y podía ser retirado por la Asamblea Legislativa a su voluntad. Más bien, la historia de la Sección 6 del Artículo V, sus términos, y las otras secciones del Artículo V claramente indican que nuestro poder constitucional para adoptar reglas cubre todas las fases del procedimiento,

618

incluyendo el procedimiento en apelación.(³³) Pero una vez
que concluímos que la Sección 6 es una fuente de facultad para
promulgar reglas de apelación, nos confrontamos en el caso
de autos con el problema de determinar si la limitación com-
prendida en la Sección 6—el requisito de remisión anterior
a la Asamblea Legislativa—es de aplicación aquí.

Quizás constituiría lo que el Juez Frankfurter ha llamado
"ultrasimplificación perniciosa" en la interpretación de esta-
tutos, el descansar en este caso sobre el escueto silogismo:
(1) la Constitución requiere la remisión de las reglas de pro-
cedimiento a la Asamblea Legislativa antes de que éstas
entren en vigor; (2) las reglas en este caso no fueron remi-
tidas a la Asamblea Legislativa; (3) en su consecuencia,.
(a) las reglas no están en vigor aún, y (b) sin tales reglas,.
la revisión debe ser mediante juicio *de novo* y no a base del
récord, a pesar del claro mandato legislativo de que la revisión.
únicamente a base del récord empezará a regir sin falta el 15·
de octubre de 1952. Rechazamos la solución de este caso me-
diante la exposición de este escueto silogismo, toda vez que la
cuestión ante nos no puede resolverse aisladamente. Por el
contrario, a fin de llegar a la conclusión correcta, este pro-
blema debe examinarse a la luz de la raigambre del poder de
los tribunales para adoptar reglas, tanto en general como en
Puerto Rico, y de las circunstancias bajo las cuales se aprobó·
la sección 19.(³⁴)

Hemos visto en la Parte I que el poder para adoptar reglas
de procedimiento originalmente era de la incumbencia de los
tribunales y que en el siglo XX ha habido un retorno a este
principio fundamental. Mientras esto sucedía, algunos tri-

_____

(³³) Hemos visto que aún desde 1941 teníamos autoridad estatutaria
para adoptar reglas de procedimiento para todos los tribunales de Puerto·
Rico. Ley núm. 9, Leyes de Puerto Rico, 1941; Parte II. Es cierto que
ninguna regla adoptamos sobre el procedimiento en apelación bajo la Ley
núm. 9 de 1941. *Collazo* v. *Puig & Abraham*, 70 D.P.R. 817; *Rodríguez* v.
*Fonalledas*, 71 D.P.R. 836. Pero ello fué así porque así lo preferimos, y
no por falta de poder.

(³⁴) "El conocimiento es esencial para poder entender; y el entendi-
miento debe preceder la facultad de juzgar." *Burns Baking Co.* v. *Bryan*,.
264 U. S. 504, 520, opinión disidente del Juez Brandeis.

bunales afirmaron que la facultad de ellos de promulgar reglas era inherente en el sentido de que la Asamblea Legislativa estaba absolutamente excluída de este campo a virtud de la doctrina de separación de poderes. Históricamente, esta teoría es difícil de sostener; y no importa cuán sabia pueda analíticamente ser, la misma no ha sido una realidad en Puerto Rico, ya sea antes o después de la Constitución. No obstante, a causa de necesidad, los tribunales tienen algún poder inherente en el campo del procedimiento; es decir, el poder de suplir tal procedimiento bien cuando éste no existe o bien cuando inadecuadamente se fija por estatuto, siempre y cuando que el mismo no sea inconsistente con las disposiciones de ley. Y este Tribunal ha resuelto que en Puerto Rico los vacíos de procedimiento pueden cubrirse mediante decisiones judiciales a virtud de los artículos 7 del Código Civil y 36 del Código de Enjuiciamiento Civil. Además, es importante indicar que los estatutos que confieren tales facultades para promulgar reglas y que no fijan normas, no son una indebida delegación de poder legislativo. Esto es así porque la facultad de proveer el procedimiento para las cortes es una que se goza concurrentemente tanto por los tribunales como por la asamblea legislativa; por consiguiente, tal estatuto es una retirada del campo del procedimiento más bien que una delegación de poderes.

En la Parte II vimos, después de una vacilante historia, que en Puerto Rico la adopción de reglas por los tribunales descansa ahora sobre bases sólidas. Además de la facultad de la judicatura de suplir procedimiento, a virtud de los artículos 7 del Código Civil y 36 del Código de Enjuiciamiento Civil, aquí, como en cualquier otra parte, la facultad judicial de adoptar reglas ha sido reconocida como un retorno a los principios fundamentales y como "una función propia del Poder Judicial". Aun más importante, esta facultad se establece en nuestra Constitución como básicamente inherente a los tribunales y como un poder primariamente judicial más bien que legislativo.

En la Parte III describimos en detalle la situación práctica con que se confrontó la Asamblea Legislativa en julio de 1952. Una Constitución que traería drásticas reformas judiciales estaba próxima a entrar en vigor. A fin de complementar estas reformas, era imperativo que se aprobara legislación dentro de pocos días, para empezar a regir inmediatamente. Esta legislación incluía un nuevo sistema de revisión en apelación de las sentencias del tribunal de distrito. Sin embargo, la Asamblea Legislativa sabía que el sustituir el juicio *de novo* en apelación por la revisión por el récord, exigía que se redactara de nuevo el procedimiento en apelación. Si bien proveyó en la sección 19 parte del procedimiento para estas apelaciones, la Asamblea Legislativa no incorporó el procedimiento completo para ello en la Ley de la Judicatura. Si estuviésemos compelidos a següir la Sección 6 del Artículo V de la Constitución al promulgar el resto de las reglas de procedimiento, éstas no podían empezar a regir hasta transcurridos sesenta días de la terminación de la sesión ordinaria de la Asamblea Legislativa a la cual se sometieran dichas reglas. En consecuencia, junto con las otras reformas en la Constitución y en la Ley de la Judicatura que empezaban a regir inmediatamente, la Asamblea Legislativa dispuso: (1) la revisión por el récord en vez del juicio *de novo* empezaría a regir el 15 de octubre de 1952; (2) como las nuevas reglas de procedimiento eran necesarias para este nuevo sistema de revisión, este Tribunal adoptaría estas reglas, presumiblemente para el 15 de octubre de 1952, para empezar a regir sin remitirlas a la Asamblea Legislativa.

Creemos que bajo las anteriores circunstancias la sección 19 era válida al autorizarnos a adoptar reglas para las apelaciones del Tribunal de Distrito al Tribunal Superior sin remitirlas a la Asamblea Legislativa. Cuando empezó a regir la Constitución el 25 de julio de 1952, la sección 2 del artículo V, que creó un nuevo sistema judicial, tuvo vigencia inme-

diata. No estaba sujeta a ningún evento futuro; empezó a regir en seguida, junto con las otras disposiciones de la Constitución.

Por consiguiente la Asamblea Legislativa sólo tuvo el breve término de tres semanas dentro del cual redactar y aprobar una Ley de la Judicatura, que complementaría las disposiciones del Artículo de la Rama Judicial. Es cierto que bajo la Sección 1 del Artículo IX, véase el escolio 32, los anteriores estatutos y reglas procesales, que no estuvieren en conflicto con la Constitución, continuarían en vigor. Pero, por los motivos indicados en la Parte III, era necesario llevar a efecto varios reajustes. En la Ley núm. 11 la Asamblea Legislativa proveyó para algunos de estos reajustes procesales; delegó la promulgación de otros a este Tribunal.

La sección 19 fué aprobada para empezar a regir el 15 de octubre de 1952. Se arguye que es inválida en tanto en cuanto contenía disposiciones procesales que empezaron a regir después de la vigencia de la Constitución, sin esperar a que nosotros iniciáramos las reglas de procedimiento a tenor con la Sección 6 del artículo V de la Constitución. Asimismo se alega que al adoptar las reglas, según lo autoriza la sección 19, veníamos compelidos primeramente a remitirlas a la Asamblea Legislativa, según lo dispone la Sección 6 del artículo V. Pero estos dos argumentos pasan por alto la situación con que se confrontaba la Asamblea Legislativa el 25 de julio de 1952.

En dicho día ninguna regla empezó a regir a virtud de la Sección 6 del artículo V. Por el contrario, los términos de la Sección 6 contemplaban una considerable demora: las reglas serían adoptadas por nosotros en el futuro, luego serían remitidas a la Asamblea Legislativa al comienzo de una sesión ordinaria, y no empezarían a regir hasta transcurridos sesenta días después de finalizar la sesión. Sin embargo, la Constitución dispuso que el nuevo sistema judicial empezaría a funcionar inmediatamente, junto con el poder de la Asamblea Legislativa de organizar los tribunales de conformidad

con la Constitución. Y la Asamblea Legislativa ejercitó este poder al aprobar la Ley núm. 11, que empezó a regir simultáneamente con la Constitución.

El problema era que el nuevo sistema judicial, para poder funcionar eficazmente, requería algunas nuevas disposiciones procesales. La Convención Constituyente y la Asamblea Legislativa tenían ambas conocimiento de que el método establecido por la Sección 6 del Artículo V no podía utilizarse para ese fin inmediato. En verdad, no empece el considerable trabajo y estudio invertido en ello, este Tribunal todavía no está en condiciones de adoptar las reglas de procedimiento. Por consiguiente, transcurrirán tres años antes de que las primeras reglas de procedimiento empiecen a regir a tenor con la Sección 6 del Artículo V. Obviamente, la Convención Constituyente no tuvo por miras crear un vacío; su propósito fué que alguien tuviera el poder de efectuar estos cambios procesales que se hicieron necesarios de la noche a la mañana, en lo que a la larga se adoptaban las disposiciones contempladas por la Sección 6 del Artículo V. Resolver lo contrario sería imputarle a la Convención la intención de establecer un período en que se congelaría el procedimiento y se estancaría el sistema judicial de Puerto Rico durante su etapa más dinámica.

La Sección 6 del Artículo V no impidió que la Asamblea Legislativa aprobara legislación transitoria—mientras nosotros adoptábamos las reglas bajo la Sección 6—que era imperativa para que pudiera funcionar el nuevo sistema judicial creado por el Artículo de la Rama Judicial de la Constitución y por la Ley de la Judicatura que lo complementó. Por el contrario, la Convención Constituyente previó los problemas que inevitablemente surgirían durante el período de transición entre la fecha de vigencia de la Constitución y la adopción de las reglas bajo la Sección 6 del Artículo V. Para hacerse cargo de ésta y de otras contingencias, el Artículo IX, Disposiciones Transitorias, dispuso en su Sección 7 que "La Asamblea Legislativa podrá aprobar las leyes que fueren ne-

cesarias para complementar y hacer efectivas estas disposiciones transitorias a fin de asegurar el funcionamiento del Gobierno, hasta que los funcionarios que en esta Constitución se proveen sean electos o nombrados y tomen posesión de sus cargos, *y hasta que esta Constitución adquiera vigencia en todos sus aspectos.*" (Bastardillas nuestras.) La lógica y la necesidad imponen la conclusión de que la Sección 7 hizo posible a la Asamblea Legislativa el aprobar el procedimiento contenido en la sección 19 de la Ley núm. 11, para regir el 15 de octubre de 1952, hasta que este Tribunal tuviera la oportunidad de cumplir con el mandato Constitucional adoptando las reglas de procedimiento conforme a la Sección 6 del Artículo V de la Constitución. Y creemos que es obvio que la Asamblea Legislativa, cuyos miembros no cambiaron hasta enero de 1953, podía anticipar el problema y proveer para el mismo el 24 de julio de 1952, en vez de esperar hasta después que la constitución empezara a regir el 25 de julio de 1952 y creara las dificultades de ajuste que hemos descrito.

Los debates en la Convención Constituyente concuerdan con la interpretación que hemos dado a la Sección 7 del Artículo IX. Debe tenerse en cuenta que el asunto ante nos no envuelve la cuestión de disposiciones transitorias en relación con la elección o nombramiento de funcionarios, cuestión ésta que algunos de los delegados discutieron en el debate sobre la Sección 7. Aquí el problema es legislación transitoria, que autoriza la Sección 7 "hasta que esta Constitución adquiera vigencia en todos sus aspectos."

Opinamos que los comentarios del delegado Trías Monge sobre la Sección 7 apoyan nuestra posición, si se leen como un todo y si tenemos en cuenta que el problema ante nos es el significado de la cláusula "hasta que esta Constitución adquiera vigencia en todos sus aspectos," y no una cuestión de elección o nombramiento de funcionarios. El delegado Trías Monge dijo a la pág. 819 del Diario de Sesiones, Convención Constituyente de Puerto Rico, lo siguiente:

"Consideramos que la Sección 7 de esta Disposición Transitoria es absolutamente indispensable. Es una sección usual en disposiciones transitorias en las Constituciones estaduales. Ésta específicamente está calcada sobre el modelo de la Constitución de New Jersey y su único propósito es simplemente el aclarar que deposita suficiente poder constituyente en la Asamblea Legislativa, únicamente para fines de proveer para una transición adecuada entre el momento en que entre en vigor la Constitución y el momento en que los funcionarios que bajo ella se dispone, son electos o nombrados y toman posesión de sus cargos.

"*La contención del compañero, al efecto de que es imposible de que esta Constitución entre en vigor por etapas, nos parece que no es correcta,* en cuanto es claro que si por ejemplo esta Constitución entra en vigor en Octubre, o en cualquier fecha anterior a las elecciones generales, o que se disponen bajo la Carta Orgánica o que se dispongan bajo la Sección 10 de estas mismas Disposiciones Transitorias, algunas de sus disposiciones, por necesidad, no van a entrar en todo su vigor en el sentido de entrar en aplicación total, o sea por ejemplo, si se provee para la elección de un Gobernador, dentro de blanco meses, de entrar en vigor la Constitución y de miembros una Asamblea Legislativa, pues, naturalmente, que entra en vigor, pero ese aspecto no está cumplimentado. Es el fin básico de una disposición transitoria. El llenar el hueco entre el momento en que entra en vigor la Constitución y el momento en que los funcionarios que son nombrados o electos bajo ella, han de tomar posesión de sus cargos.

"*Y se deposita suficiente poder en la Asamblea Legislativa para si estas Disposiciones Transitorias no cubren todas las eventualidades que hay que cubrir, que la Asamblea Legislativa tenga suficiente poder para hacerlo.* Es claro que no tenemos tiempo aquí para hacer una revisión detallada de todos los estatutos de la Asamblea Legislativa del Pueblo de Puerto Rico. Podemos cubrir simplemente aquellos aspectos generales de la transición y que la implementación de los detalles de esta transición quede, *por un período limitado,* en manos de la Asamblea Legislativa." (Bastardillas nuestras.)

Los comentarios de otros delegados que fueron responsables de la Sección 7 en la comisión también justifican la posición que hemos asumido. El delegado Polanco Abreu dijo

a las págs. 819–20 del Diario de Sesiones que "La Comisión entiende que no solamente es necesaria, sino que es indispensable, no solamente que no es peligrosa, sino que es útil para el mejor desenvolvimiento del mecanismo, que ha de conducir a la aplicación efectiva de todos los postulados que consagramos en la Constitución. . . . Esta disposición cubre cualquier omisión involuntaria en que hayamos podido incurrir al establecer el mecanismo para la ejecución de las disposiciones de la Constitución. . . . Srta. Presidenta, repetimos que esta disposición lo único que intenta garantizar es que nosotros hayamos podido incurrir en alguna omisión involuntaria. Sabido es lo limitado del saber humano, sabido es que nosotros como seres humanos no podemos garantizar que en unas disposiciones transitorias, vayamos a consignar todo, absolutamente todo, sin olvidarnos de nada, de lo que sea necesario para la ejecución de las disposiciones de esta Constitución. Esta disposición no tiene otro alcance que el cubrir cualquier omisión en que hayamos podido incurrir."

El delegado Solá Morales confirmó estos puntos de vista. Dijo dicho delegado a las págs. 821–2: "De complementar. Lo que ocurre es, que, ni un individuo, ni un Parlamento, ni una Convención Constituyente, a mi juicio, puede confiar tanto en su sabiduría, que esté segura que en el limitado espacio de unas expresiones de una Constitución, se van a cubrir todas las eventualidades que puedan ocurrir, y que trastornen el orden en cualquier aspecto del Gobierno o de la vida de un pueblo en la transición que se opere al entrar en vigor una Constitución. Y claramente el vocablo 'complementar' aquí implica que ante esa posible variabilidad del ser humano y de los hombres que componen cualquier organismo de éstos, que alguna cosa se quede sin proveer en estas disposiciones transitorias y que surja un problema para la vida del pueblo, que haya un organismo como una Asamblea Legislativa, electa por ese mismo pueblo con autoridad suficiente para cubrir ese hueco y no permitir que el pueblo sufra perjuicios en la transición de un gobierno a otro."

Por los motivos que hemos expuesto, resolvemos que la Asamblea Legislativa tenía poder bajo las circunstancias concurrentes, para fijar, como medida transitoria, la limitada porción de procedimiento para las apelaciones del Tribunal de Distrito al Tribunal Superior que se encuentra en la sección 19 de la Ley núm. 11, no obstante el hecho de que la sección 19 empezó a regir después de la proclamación de la Constitución, la cual confirió a este Tribunal en la Sección 6 del Artículo V la función de iniciar las reglas de procedimiento. Una vez que llegamos a esta conclusión, surge que la Asamblea Legislativa, teniendo el poder de aprobar tales medidas transitorias de procedimiento, independientemente de la Sección 6 del Artículo V, podía válidamente delegarnos la facultad transitoria de completar el procedimiento hallado en la sección 19 mediante reglas que de igual manera no tenían que ser adoptadas a tenor con la Sección 6 del Artículo V. Es decir, una vez que se admite que bajo todas las circunstancias que concurren la Sección 7 del Artículo IX permitía que la Asamblea Legislativa adoptara medidas transitorias de procedimiento, ésta podía incondicionalmente delegar a este Tribunal la facultad transitoria de redactar reglas en cuanto a las porciones restantes del procedimiento que era necesario, por todos los motivos expuestos en las Partes I y II, especialmente en aquella parte del texto de esta opinión que precede al escolio 12. Esta específica delegación de facultad transitoria no tiene relación con y no debe confundirse con el poder permanente de este Tribunal de adoptar reglas, conferídole por la Sección 6 del Artículo V de la Constitución. Cuando la Asamblea Legislativa quiso referirse a este último, así lo hizo—como hemos visto en la Parte III—en la sección 2 de la Ley núm. 11. La delegación específica a este Tribunal del poder para promulgar reglas en la sección 19 está limitada al período especial y transitorio por el cual nuestro sistema judicial está atravesando en la actualidad.

Nuestro criterio de que la sección 19 era válida al establecer algún procedimiento para las apelaciones del Tribunal

de Distrito al Tribunal Superior y al delegarnos el poder de adoptar el resto del procedimiento mediante reglas sin remitirlas previamente a la Asamblea Legislativa, fué aparentemente compartido por lo menos por 39 de los miembros de la Convención Constituyente. Estos 39 miembros de la Constituyente también eran miembros de la Asamblea Legislativa que aprobó la sección 19. El entonces Procurador General de Puerto Rico, que era un Delegado a la Constituyente, hizo un vigoroso llamamiento a favor de la aprobación de la Ley de la Judicatura, que contenía la sección 19, en la audiencia que sobre la misma se celebró. *Transcripción del Récord Taquigráfico, Vista Pública, P. de la C*. 14 pág. 10 *et seq*. El Presidente de la Comisión de la Rama Judicial de la Convención Constituyente, que también era el *Speaker* de la Cámara de Representantes en la Asamblea Legislativa, introdujo en la Cámara la Ley de la Judicatura, con dicha sección 19. Los entonces miembros de este Tribunal participaron en la redacción de la Ley de la Judicatura. Clark y Rogers, supra, 61 Yale L. J. 1147, 1148–9; Clark, *Report to the Attorney General, Actas*, supra, pág. 378. Luego de ser aprobada, procedimos a promulgar las Reglas a virtud de la sección 19 sin remitirlas previamente a la Asamblea Legislativa.([35]) Si bien estas reglas no fueron formalmente remitidas a la sesión ordinaria de 1953 de la Asamblea Legislativa, desde luego ésta tenía conocimiento de la existencia de dichas reglas. Sin embargo, ni la Asamblea Legislativa ni ninguna de sus Comisiones hizo sugerencia alguna de que nuestra actuación era indebida y debía derogarse.([36]) Aun cuando no es con-

([35]) El que nosotros adoptemos reglas, naturalmente no impide que un litigante ataque la validez de las mismas. *Sibbach* v. *Wilson & Co*., supra.

En nuestra Resolución del 7 de octubre de 1952 adoptando las Reglas aquí envueltas, fuimos cuidadosos en mencionar la sección 19 de la Ley núm. 11 como la fuente de nuestra autoridad para adoptar dichas reglas. Deliberadamente omitimos toda mención de la sección 6 del Artículo V de la Constitución.

([36]) En una situación análoga, el Tribunal Supremo de los Estados Unidos decidió que el hecho de que el Congreso no interviniera con una regla, operaba a favor de la validez de tal regla. *Sibbach* v. *Wilson & Co*., supra, pág. 15.

cluyente, creemos que a los contemporáneos puntos de vista que hemos dejado expuestos, debe dárseles peso al considerar la validez de la sección 19. *Cherey* v. *City of Long Beach*, **26** N. E.2d 945, 949 (C. A., N. Y., 1940) ; *Platte Valley Pub. Pow. and Irr. Dist.* v. *Lincoln County*, 14 N. W.2d 202, 205 (S. Ct., Neb., 1944) ; *Mayor and City Council of Baltimore* v. *Hofrichter*, 11 A.2d 375, 378 (C. A., Md., 1940) ; *Sanger* v. *City of Bridgeport*, 198 Atl. 746, 749 (St. Ct., Conn. 1938) ; see *Ex parte Ming*, 181 Pac. 319 (S. Ct., Nev., 1919).

*La petición del acusado para que se expida auto de certiorari será declarada sin lugar.*

---

Opinión disidente del JUEZ ASOCIADO SEÑOR BELAVAL.

El peticionario en este caso señor José Celso González Vélez, nos solicita que anulemos una resolución dictada por el Tribunal Superior de Puerto Rico, Sala de Ponce, por la cual se le denegó un juicio *de novo* solicitado por el peticionario, para apelar de una sentencia dictada en contra del peticionario por el Tribunal de Distrito de Puerto Rico.

Como fundamento principal para solicitar de este tribunal la expedición de un auto de *certiorari*, alega, que el Tribunal Superior de Puerto Rico, Sala de Ponce, cometió error de procedimiento al resolver, que las "Reglas que gobiernan las apelaciones del Tribunal de Distrito al Tribunal Superior del Estado Libre Asociado de Puerto Rico", adoptadas por este tribunal el 7 de octubre de 1952, de acuerdo con las secciones 19 y 37 de la Ley número 11 de 24 de julio de 1952 de la anterior Asamblea Legislativa de Puerto Rico, para regir desde el 15 de octubre de 1952, no confligen con las disposiciones de la Sección 6 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico, en tanto en cuanto dispone la sección 37 de la Ley número 11 de 24 de julio de 1952 y la regla 10 de las reglas adoptadas por este tribunal el 7 de octubre de 1952, que dichas reglas empezarán a regir el 15 de octubre de 1952, cuando de acuerdo con la Sección 6 del

Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico, han debido empezar a regir "sesenta días después de la terminación" de la sesión ordinaria de la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico, que comenzó en el mes de enero de 1953.

Los fundamentos que tuvo el ilustrado Juez Sentenciador señor J. M. Martín Almodóvar para denegar la solicitud del juicio *de novo* solicitado por el peticionario, están expuestos en una resolución dictada en un caso similar titulado El Pueblo de Puerto Rico v. Amador Vélez Ramos, sobre Acometimiento y Agresión Grave, numerado criminal TS-52 M-30 del Tribunal Superior de Puerto Rico, Sala de Ponce. En síntesis, las conclusiones del tribunal recurrido fueron las siguientes: (1) el derecho de apelación de un tribunal de distrito (antes tribunal municipal) a un tribunal superior (antes tribunal de distrito) es un derecho estatutario, y por lo tanto, no siendo un derecho constitucional, la Asamblea Legislativa de Puerto Rico tenía facultad para establecerlo en la forma que creyere conveniente; (2) la Asamblea Legislativa de Puerto Rico pudo delegar en el Tribunal Supremo de Puerto Rico la facultad de aprobar reglas para que el derecho de apelación creado en virtud de una ley pudiera ser ejercitable; (3) independientemente de cualquier autorización legislativa, los tribunales de última instancia tienen facultades inherentes para aprobar reglas que regulen el procedimiento de apelación; (4) la Sección 6 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico, en tanto en cuanto establece, que las reglas de evidencia y de procedimiento civil y criminal, adoptadas por el Tribunal Supremo deben ser enviadas a la próxima sesión ordinaria de la Asamblea Legislativa de Puerto Rico, y no entrarán en vigor hasta sesenta días después de la terminación de dicha sesión, si no hubiere desaprobación expresa, no es aplicable a las reglas adoptadas por el Tribunal Supremo de Puerto Rico para regular las apelaciones de las resoluciones y sentencias de los tribunales de distrito a los tribunales superiores, por-

que el derecho de apelación no es un derecho constitucional, no constituye en sí mismo un procedimiento que forme parte del juicio, y puede estar comprendido entre las reglas de administración.

Los fundamentos alegados por el peticionario en su solicitud de un auto de *certiorari* y por el ilustrado juez sentenciador en su resolución, nos obligan a considerar las siguientes proposiciones de derecho: (1) cuáles fueron las bases establecidas para la reforma legislativa sobre la regulación de los procedimientos judiciales por la propia rama judicial; (2) cuál es el verdadero alcance del poder inherente de los tribunales; (3) la verdadera naturaleza del derecho de apelación; (4) la constitucionalidad de los estatutos que delegan en la rama judicial el derecho a reglamentar los procedimientos ante los tribunales; (5) la posible constitucionalidad o inconstitucionalidad de las secciones 19 y 37 de la Ley número 11 de 24 de julio de 1952, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico.

1. Cuando en el 1787 se adopta la Constitución de los Estados Unidos de América, a pesar de los textos políticos de Burke, del Espíritu de las Leyes de Montesquieu, del Tratado sobre Derecho Civil de Locke, del Leviatan de Hobbes, el balance de la distribución de poderes se inclina en favor del Congreso, siguiendo el precedente inglés producto de la revolución burguesa del 1662. Vide: *The Constitutional History of the United States*—Homer Carey Hockett—The Macmillan Company—Edición del 1939.

Las dos secciones del Artículo III de la Constitución Federal que se refieren al Tribunal Supremo de Estados Unidos, son bastante escuetos:

"Sección 1.—El Poder Judicial de los Estados Unidos residirá en un Tribunal Supremo y en los tribunales inferiores que de tiempo en tiempo el Congreso creare y estableciere. Los Jueces sean del Tribunal Supremo o de los tribunales inferiores, conservarán sus cargos mientras observen buena

conducta y recibirán por sus servicios, en períodos fijos, un sueldo que no se les podrá disminuir mientras continúen ocupando sus cargos.

"Sección 2.—1º—El Poder Judicial se extenderá a todos los casos que en derecho y equidad surjan bajo esta constitución, a las leyes de los Estados Unidos y los tratados hechos o que por su autoridad se hagan; a todos los que afecten a embajadores y demás ministros públicos y cónsules; a todos los de almirantazgo y jurisdicción marítima; a las contiendas en que sean parte los Estados Unidos, a las que nazcan entre dos o más estados, entre un estado y los ciudadanos de otro estado, entre ciudadanos de diferentes estados, entre ciudadanos del mismo estado que reclamen concesiones de tierra de diferentes estados y entre un estado o los ciudadanos del mismo, y los estados, ciudadanos o súbditos extranjeros.

"2º—De los casos que afecten a embajadores, otros ministros públicos y cónsules, y en aquellos en que sea parte un estado, conocerá en primera instancia el Tribunal Supremo. De todos los demás antes mencionados, conocerá el Tribunal Supremo. *en grado de apelación, tanto en cuanto al derecho como en cuanto a los hechos, con las excepciones que establezca y bajo los reglamentos que adopte el Congreso.*"

El Septuagésimo Tercer Congreso aprobó el 19 de junio de 1934—*United States Statutes at Large*, Volumen 48, Primera Parte, página 1064—una "Ley para Conceder a la Corte Suprema de Estados Unidos Autoridad para Redactar y Publicar Reglas para Acciones en Ley", que extractada en sus contenidos pertinentes, lee como sigue:

"Que la Corte Suprema de los Estados Unidos tendrá poder para prescribir, mediante reglas generales, para las cortes de distrito de Estados Unidos y para la Corte del Distrito de Columbia, formas procesales, mandamientos, alegaciones y mociones y la práctica y procedimiento a seguirse en acciones civiles en ley. *Dichas reglas no podrán limitar, ampliar o modificar los derechos sustantivos de ningún litigante. Las reglas entrarán*

*en vigor seis meses después de su promulgación* y desde entonces cualesquiera leyes en conflicto con las mismas no tendrán fuerza ni vigor.

"La Corte puede en cualquier momento refundir las reglas generales prescritas por ella para acciones en equidad con las reglas para acciones en ley, para lograr una sola acción civil y un procedimiento uniforme para ambas . . . . . . . . . . . . . . . . . *Dichas reglas uniformes no entrarán en vigor hasta que hayan sido sometidas al Congreso por el Procurador General al comienzo de una sesión ordinaria y hasta después de levantarse dicha sesión.*"

El 20 de diciembre de 1937—82 L. ed. 1552 appendix IV— la Corte Suprema de Estados Unidos adoptó mediante orden al efecto, las Reglas de Procedimiento para las Cortes de Distrito de Estados Unidos y autorizó a su Juez Presidente, "para remitir las reglas adoptadas al Procurador General, requiriéndole, para que dicho Procurador General, según se provee por la sección 2 de la ley de 19 de junio de 1934, remitiera dichas reglas al Congreso al inicio de su sesión regular en el próximo enero."

El Septuagésimo Sexto Congreso aprobó el 29 de junio de 1940—*United States Statutes at Large*, Volumen 54 Primera Parte, página 688—otra "Ley para Conceder a la Corte Suprema de Estados Unidos Autoridad para Prescribir Reglas para Alegaciones, Prácticas y Procedimientos con respecto a Procedimientos en Casos Criminales antes y después del Veredicto o Alegación de Culpabilidad," que extractada en sus contenidos pertinentes, lee como sigue:

"Que la Corte Suprema de los Estados Unidos tendrá poder para promulgar de tiempo en tiempo reglas para las alegaciones, práctica y procedimiento con relación a cualquier o a todos los procedimientos antes y después de veredicto, o conclusión de culpabilidad, o inocencia por un tribunal de derecho si se hubiere renunciado al jurado, o alegación de culpabilidad en los casos criminales ante las cortes de distrito de los Estados Unidos . . . *Dichas reglas no entrarán en vigor hasta que hayan sido sometidas al Congreso por el Procurador General al comienzo de la*

*sesión y hasta después de levantarse dicha sesión,* y desde enton-
ces cualesquiera leyes en conflicto con las mismas no tendrán
fuerza ni vigor."

El día 26 de diciembre de 1944,—89 L. ed. 2150 appendix
III—, la Corte Suprema de Estados Unidos mediante orden
al efecto, adoptó las Reglas de Procedimiento Criminal para
las Cortes de Distrito de Estados Unidos y autorizó a su Juez
Presidente "para remitir las reglas adoptadas al Procurador
General, requiriéndole para que dicho Procurador General,
según se provee por la ley, transmitiera dichas reglas al Con-
greso al inicio de su sesión regular de enero 1945.

Como se ve, una de las características principales de am-
bas leyes, era que las reglas adoptadas no tendrían fuerza de
ley ni propio vigor, hasta que el Congreso no tuviera oportu-
nidad de pasar sobre ellas. ¿Cuál podía ser la razón para
limitar en esta forma la delegación de poder conferida? La
promulgación de las nuevas reglas indudablemente dejaba
sin efecto todas las leyes procesales del Congreso que estuvie-
ran en conflicto con dichas reglas. Era natural que el Con-
greso tuviera interés en conocer como serían alteradas sus
propias leyes procesales, por las nuevas reglas de procedi-
miento adoptadas por la Corte Suprema.

El artículo 40 de la Ley Orgánica de Puerto Rico, apro-
bada el 2 de marzo de 1917 por el Congreso de Estados Uni-
dos, establecía que en Puerto Rico "el poder judicial residirá
en las cortes y tribunales de Puerto Rico ya establecidos y en
ejercicio de acuerdo y por virtud de las leyes vigentes" y que
*"la jurisdicción de dichos tribunales y los trámites seguidos
en ellos,* así como los distintos funcionarios y empleados de
los mismos continuarán como al presente hasta que otra cosa
se disponga por ley", y que, la Asamblea Legislativa de Puerto
Rico tendrá autoridad que no esté en contradicción con esta
ley, de tiempo en tiempo, según lo crea conveniente, para
organizar, modificar o hacer un nuevo arreglo de los tribu-
nales y su *jurisdicción y procedimientos.*

Por la facultad conferida por dicho artículo, la anterior Asamblea Legislativa de Puerto Rico aprobó la Ley número 9 de 5 de abril de 1941 ( (1) pág. 331) "Confiriendo a la Corte Suprema de Puerto Rico facultad para promulgar y poner en vigor reglas en procedimientos judiciales; autorizando al Consejo Judicial para actuar como Junta Consultiva en la selección y promulgación de dichas reglas; derogando las leyes en conflicto con la presente", que extractada en sus contenidos pertinentes, lee como sigue:

"Sección 1.—La Corte Suprema de Puerto Rico, mediante reglas que promulgará y pondrá en vigor de tiempo en tiempo, tendrá la facultad de regular los procedimientos judiciales en todas las cortes de Puerto Rico, con el propósito de simplificar los mismos y promover una rápida administración de justicia. Tales reglas no podrán derogar, ampliar o modificar los derechos sustantivos de los litigantes.

*"Una vez aprobadas dichas reglas se remitirá copia de las mismas a la Asamblea Legislativa en su próxima sesión ordinaria y no comenzarán a regir hasta la clausura de dicha sesión"* . . .

"Sección 3.—Toda ley concerniente a alegaciones, práctica o procedimiento judicial en vigor al ser aprobada esta ley, se considerará como regla de la Corte Suprema y continuará en vigor como tal, a menos que sea modificada, enmendada o derogada por reglas promulgadas de acuerdo con lo dispuesto en esta Ley."

Después de redactada las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico por este tribunal, el día 18 de marzo de 1943, el Juez Presidente señor Emilio del Toro, le dirigió la siguiente comunicación a la Asamblea Legislativa de Puerto Rico:

"Al Senado y a la Cámara de Representantes de Puerto Rico reunidos en sesión ordinaria: Por orden del tribunal y en cumplimiento de lo dispuesto en la Ley núm. 9 de 1941, pág. 331, tengo el honor de remitir a esa Asamblea copia de las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico aprobadas por la Corte Suprema de acuerdo con dicha ley para comenzar a regir el primero de septiembre próximo." (60 D.P.R. III).

No habiendo tomado acción las comisiones de lo jurídico Civil del Senado, ni de la Cámara de Representantes, ni considerado dichas reglas el Senado de Puerto Rico ni la Cámara de Representantes de Puerto Rico, según certificaciones expedidas por los señores Ildefonso Solá Morales y José Enrique Gelpí, 60 D.P.R. IV y V, dichas reglas quedaron promulgadas para tener efecto el primero de septiembre 1943, por ministerio de la Ley número 9 de 1941.

Posteriormente, sin embargo, la Asamblea Legislativa de Puerto Rico aprobó el 25 de abril de 1946 ( (1) pág. 1357) la Ley número 465 "Para Determinar que las Reglas hasta ahora promulgadas y puestas en vigor por el Tribunal Supremo de Puerto Rico serán Reglas que Regularán los Procedimientos Judiciales en todas las Cortes de Puerto Rico; para Disponer la Forma en que se podrán Enmendar dichas Reglas y para otros fines", que extractada en sus contenidos pertinentes, lee como sigue:

"Sección 1.—Las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico promulgadas y puestas en vigor por el Tribunal Supremo de Puerto Rico serán las reglas que regularán los procedimientos judiciales en todas las cortes y tribunales de Puerto Rico.

"Sección 2.—Las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico referidas en la Sección precedente *serán enmendadas o derogadas bien por iniciativa y acción de la Asamblea Legislativa de Puerto Rico o bien* en la forma siguiente: siempre que a juicio del Tribunal Supremo de Puerto Rico fuere necesario enmendar o derogar una cualquiera de las reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico, el Tribunal Supremo de Puerto Rico después de adoptar el acuerdo correspondiente en cuanto a la enmienda o derogación que considere aconsejable, *remitirá copia certificada de dicho acuerdo a la Asamblea Legislativa de Puerto Rico antes de que comience su sesión ordinaria inmediatamente siguiente a la fecha en que se adopte tal acuerdo. Si la Asamblea Legislativa de Puerto Rico levantara su dicha sesión sin haber adoptado acción alguna con referencia a dicho acuerdo, éste será promulgado y puesto en vigor por el Tribunal Supremo de Puerto Rico.*

"Sección 3.—Toda ley o parte de ley que se oponga a la presente queda por ésta derogada; Disponiéndose sin embargo, que salvo lo que se dispone en esta ley, quedará en toda su fuerza y vigor la ley número 9 aprobada en 5 de abril de 1941."

Como se ve, por esta segunda ley, la anterior Asamblea Legislativa de Puerto Rico vuelve a promulgar las Reglas que ya habían entrado en vigor de acuerdo con las facultades conferidas a este tribunal por la primera ley, y ahora de una manera expresa, consagra su derecho a enmendarlas o derogarlas, aunque ya estén promulgadas por el Tribunal Supremo de Puerto Rico.

El último estatuto adoptado por la anterior Asamblea Legislativa de Puerto Rico es la Ley número 25 de 15 de abril de 1948 ((1) pág. 51), enmendatoria del título y las secciones 1, 2 y 3 de la Ley número 9 de 5 de abril de 1941, que extractada en sus contenidos pertinentes, lee como sigue:

"Artículo 1.—Sección 1.—La Corte Suprema de Puerto Rico queda por la presente facultada *para redactar y proponer* a la Asamblea Legislativa reglas para los procedimientos judiciales en todas las cortes de Puerto Rico con el propósito de simplificar los mismos y promover una rápida administración de justicia.

"Una vez redactada dichas reglas por la Corte Suprema de Puerto Rico, se remitirá copia de las mismas a la Asamblea Legislativa para su estudio y consideración. Dichas reglas empezarán a regir en la fecha y con las enmiendas con que fueren aprobadas por la Asamblea Legislativa . . . .

"Sección 3.—Toda ley concerniente a alegaciones, práctica o procedimiento judicial en vigor al ser aprobada esta Ley, continuará en vigor como tal, a menos que sea modificada, enmendada o derogada por la Asamblea Legislativa.

"Artículo 2.—Las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico aprobada por la Corte Suprema de Puerto Rico de conformidad con la Ley número 9 de 5 de abril de 1941, *continuarán en vigor y tendrán fuerza de ley hasta que sean modificadas, enmendadas o derogadas por la Asamblea Legislativa.*

"Artículo 3.—La Ley número 465, aprobada en 25 de abril de 1946, queda expresamente derogada.

"Artículo 4.—Las Reglas de Enjuiciamiento Criminal para las Cortes de Puerto Rico remitidas por la Corte Suprema a la Asamblea Legislativa de conformidad con la Ley núm. 9 de 5 de abril de 1941, *regirán en la fecha y con las enmiendas con que fueren aprobadas por la Asamblea Legislativa;* Disponiéndose, que el Código de Enjuiciamiento Criminal de Puerto Rico, edición de 1935, según ha sido subsiguientemente enmendado continuará en todo su vigor y con fuerza de ley hasta tanto sea modificado, enmendado o derogado por la Asamblea Legislativa."

Un estudio comparativo de las tres leyes aprobadas por la anterior Asamblea Legislativa de Puerto Rico, la Ley número 9 de 5 de abril de 1941, la Ley número 465 de 25 de abril de 1946 y la Ley número 25 de 15 de abril de 1948, demuestra sin lugar a dudas, que durante el transcurso del tiempo legislativo ocurrido entre la primera y la última, la anterior Asamblea Legislativa de Puerto Rico cambia su política en dos extremos importantes, a saber, (1) que mientras en la primera ley, siguiendo el modelo adoptado por el Congreso de Estados Unidos, deja en manos del Tribunal Supremo de Puerto Rico un procedimiento completo para la adopción y promulgación de reglas de procedimiento, sujeto a una aprobación tácita o desaprobación expresa, (2) en la última ley se le deja al Tribunal Supremo de Puerto Rico la iniciativa en la redacción de las reglas pero la Asamblea Legislativa se reserva la aprobación expresa de las mismas antes de entrar en vigor.

En diciembre de 1951, cuando se reúne la Convención Constituyente de Puerto Rico para considerar el poder del Tribunal Supremo de Puerto Rico para reglamentar los procedimientos judiciales, se somete la siguiente proposición:

"El Tribunal Supremo adoptará, para los tribunales, reglas de evidencia y de procedimiento civil y criminal que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes. *Las reglas así adoptadas se remitirán a la Asamblea Legislativa al comienzo de su próxima sesión ordinaria y regirán sesenta días después de la terminación de dicha sesión,* salvo desaprobación por la Asamblea Legislativa, la cual *tendrá facultad,*

*tanto en dicha sesión como posteriormente, para enmendar, derogar o complementar cualquiera de dichas reglas, mediante ley específica a tal efecto."*

En la discusión de la proposición presentada a la Convención Constituyente de Puerto Rico, que se realiza en la sesión correspondiente al 3 de diciembre de 1951, el delegado señor Ernesto Ramos Antonini, Presidente de la Comisión de la Rama Judicial, al informar a nombre de su comisión sobre esta importante cuestión, se expresa así:

"Tercera característica, es el poder que se le confiere al Tribunal Supremo para adoptar las reglas de procedimiento civil, criminal y de evidencia.

"Actualmente, *hay un asomo de ese poder en la legislación vigente,* pero podría muy bien cambiarse en cualquier momento y privar de toda facultad al Tribunal Supremo para aprobar tales reglas. Lo que hacemos es *elevar a rango constitucional el procedimiento que en alguna que otra forma ha existido desde los últimos años en nuestra legislación,* de manera que sea el propio poder judicial el que adopte las reglas de procedimiento. Bien es cierto que se conserva al poder legislativo la facultad de enmendar, derogar o suplementar las reglas adoptadas por el Tribunal Supremo, *como asimismo también el Tribunal Supremo viene obligado a someter, al comienzo de cada sesión ordinaria o de la que sea, las reglas que hayan adoptado, y no regirán hasta cerrarse la sesión.* Esto tiende a crear, de momento y de manera saludable, lo que pudiera llamarse el sistema de contrapeso entre el poder legislativo y el judicial con el ejecutivo también, pero ciertamente al *dársele la iniciativa y la facultad al Tribunal Supremo* en *relación con el cuerpo de reglas,* en general, estamos convencidos de que se desarrollará, en el curso del tiempo, un clima en el sentido de aprobación de reglas, mediante el cual será muy de tarde en tarde que la Legislatura de Puerto Rico tendrá necesidad de, intervenir en alguna forma, por vía de enmienda, derogación o suplementación realizar la función de aprobación de reglas de procedimiento." (Vide Diario de Sesiones de la Convención Constituyente de Puerto Rico—página 172, tercera columna). Esta proposición con algunas variantes en su texto original, pero que siempre fué sustancialmente la misma, es la que se convierte en la Sección 6 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico.

Cuando todavía no se había promulgado la Constitución del nuevo estado político, la anterior Asamblea Legislativa de Puerto Rico aprueba la Ley número 11 de 24 de julio de 1952 ((2) pág. 31), conocida como "Ley de la Judicatura del Estado Libre Asociado de Puerto Rico." La sección 37 de dicha ley dispone que la nueva ley "por ser de carácter urgente y necesaria, empezará a regir al entrar en vigor la Constitución del Estado Libre Asociado de Puerto Rico, con excepción de la sección 19 que entrará en vigor el 15 de octubre de 1952." Al día siguiente de aprobarse dicha ley, empezó a regir la Constitución del Estado Libre Asociado de Puerto Rico. Como se ve, la aprobación de la Ley de la Judicatura de Puerto Rico, 24 de julio de 1952 y la proclamación del Estado Libre Asociado de Puerto Rico, 25 de julio de 1952, son dos hechos simultáneos. De acuerdo con la sección 37 de la misma ley, la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico entró en vigor unas horas después, al proclamarse el nuevo estado, con excepción de la sección 19, que se supone entraría en vigor el 15 de octubre de 1952, lo cual nos hace concluir, que dicha ley se aprobó para implementar el Capítulo V de la Constitución del Estado Libre Asociado de Puerto Rico.

Examinados conjuntamente el Artículo V de nuestra Constitución y el nuevo estatuto reorganizando la rama judicial en Puerto Rico, en cuanto al poder conferido a este Tribunal para adoptar reglas de procedimiento, nos encontramos que la sección 2 de la Ley número 11 de 24 de julio de 1952, en vez de establecer legislativamente, a base de diferenciaciones permisibles dentro de la distribución de poderes, un contenido distinto a la Sección 6 del artículo V de la Constitución, establece en su sección 2 que "el Tribunal Supremo adoptará . . . reglas de evidencia y de procedimiento civil y criminal . . . de *conformidad con lo provisto por la Constitución del Estado Libre Asociado.*" Y para que no haya duda de la intención legislativa, si en algo pudiéramos usar de la intención legislativa para dictaminar sobre la constitucionalidad de un

estatuto, sigue disponiendo en la misma sección 2: "toda disposición estatutaria o de reglamentación existente en la actualidad sobre procedimiento civil y criminal y de evidencia, permanecerá en vigor hasta que la misma sea modificada, suplementada o enmendada por el Tribunal Supremo de *acuerdo con la Constitución del Estado Libre Asociado de Puerto Rico.*" Cuando analicemos la posible constitucionalidad o inconstitucionalidad de las secciones 19 y 37 de la Ley número 11 de 24 de julio de 1952, tendremos otra oportunidad de examinar el problema dentro de una mejor situación expositiva.

2. Una de las conclusiones del fallo emitido por la sala sentenciadora parece ser que los tribunales de última instancia tienen poderes inherentes para reglamentar cualquier procedimiento, y por lo tanto, su poder de reglamentación no depende de ninguna concesión política de tipo constitucional (*constitutional grant*), ni de ninguna delegación de poder de tipo legislativo (*legislative grant*) sino de una facultad tradicionalmente reconocida a los tribunales.

El poder inherente de los tribunales es una de esas acepciones mal comprendidas que arrastra consigo la terminología jurídica, que poco a poco, se ha transformado en una regla de utilidad. A veces ha suplido el principio de autoridad suficiente para enfrentarse con una injusticia momentánea, que no hubiera podido ser remediada por el poder correspondiente, con la rapidez que el caso hubiese requerido. Haciendo uso de la simple metodología que nos ofrece la fórmula de dispersión y reunión de sus distintas unidades de significación, trataremos de esclarecer su verdadero contenido.

El poder es siempre un atributo de soberanía. Desde el instante mismo en que la política se separa de la teología, todo poder público es un hecho extraído de la realidad política que vive cada época. La base de todo poder consiste, en la auto-alienación voluntaria o involuntaria que hace el hombre de su anarquía individual, para crear el estado, siguiendo el plan trascendente del hombre dentro de la naturaleza. El plan

trascendente del hombre dentro de la naturaleza es sobre-
vivir. Nosotros no tenemos por qué intentar un deslinde
absoluto entre naturaleza e historia como se han visto obli-
gadas a realizar otras ciencias sobre el hombre. Basta dejar
consignado, que todo lo que sea naturaleza, lo arrastra el
hombre consigo como una limitación orgánica a su propia rea-
lización, mientras todo lo que sea historia, lo crea el hombre
a su alrededor, como una aspiración extraorgánica dentro de
su plan trascendente de sobrevivir. El derecho es una de
esas creaciones artificiales del plan trascendente de sobrevivir.
Todo derecho es un proceso de autoalienación de la sobe-
ranía de la propia vida, realizada por la voluntad política del
hombre para crearle un porvenir a su especie. La transfor-
mación moderna de las llamadas "obediencias pasivas", que
hizo posible la aparición del Sacro Imperio Romano, del de-
recho divino de los reyes, del Leviantan de Hobbes, a través
de las pequeñas revoluciones burguesas para la secularización
del poder, logra centrar en el hombre la unidad primaria del
poder. De manera que no hay razón, en estricto derecho pú-
blico, para despojar a este anárquico resignado, de su única
grandeza ante el misterio total que lo rodea.

El poder inherente de los tribunales no surge, como se ha
hecho creer tantas veces, de la naturaleza misma de la ins-
titución. En estricta puridad de conceptos las instituciones
no tienen naturaleza, lo que tienen es historia, representa-
ciones de la conciencia histórica de cada época. Esto de
hacer depender las cosas de su propia naturaleza es uno de
los viejos ardides del funcionalismo. Pero aunque estuvié-
ramos dispuestos a considerar al funcionalismo como genera-
dor de ciertas características extraorgánicas, que no necesitan
para nada de la conciencia histórica del hombre, es claro que
el funcionalismo no trasciende de su propia estructura, es
algo que pone un objeto en función dentro de su propia estruc-
tura, y por lo tanto, representa una limitación mejor que una
magnificación, del propio complejo funcional. Por el contra-
rio, todo poder es un fenómeno social proyectado hacia afuera,

para regir la vida política de un cuerpo histórico. Ninguna institución creada por el hombre puede funcionar por sí misma, dentro de una propulsión espontánea, a menos que no estemos dispuestos a sucumbir a las anteriores divinizaciones institucionales, o a las ingenuas racionalizaciones que el derecho existe independientemente del hombre.

Por otro lado, como hecho extraído de la realidad política de cada época, los tribunales nunca han poseído un atributo extrapolítico, en tal forma individualizado, que no dependa de la voluntad del soberano. Los tribunales siempre han ejercido poderes delegados del soberano. Ha habido momentos oscuros en la historia del concepto de soberanía, donde a primera vista nos parece percibir un poder superior a la simple delegación del soberano. Pero los estudiantes del derecho están en la obligación de no dejarse confundir por las normas artificiosas que a veces adopta la teoría, en su lucha por desvirtuar la realidad misma. Basta reflexionar un momento para darnos cuenta que este atributo extrapolítico se ha producido en momentos críticos, donde el monarca ha tenido que hacerle frente a las pretensiones eclesiásticas amparadas en el *Jus Divinum* o a las demandas populares contra la monarquía absoluta.

Un estudio desapasionado de la institución judicial desde sus orígenes occidentales, únicos que tendrían razón de ser en nuestra conciencia actual, nos demuestra que la administración de la justicia fué siempre una de las prerrogativas del soberano. La confusión que algunas veces notamos en la exposición del derecho público, proviene de confundir las transformaciones, que a través del tiempo sufre el poder del soberano, con las transformaciones de las distintas instituciones que tuvieron que surgir para hacerle frente a una realidad política distinta, durante el paulatino proceso de desintegración que sufre el poder del monarca. Lo cual demuestra que la anatomía del poder soberano no es como se ha concebido por algunos glosadores del derecho público, un cuerpo de principios fijos e inmutables de los cuales pueda deducirse cual-

quiera fórmula política, sino una institución humana sujeta a desintegraciones, ·reintegraciones, regresiones y transformaciones, de acuerdo con la realidad de poder actuante en cada época.

Otra de las versiones menos científicas sobre el poder inherente de los tribunales es, que su autoridad para reglamentar los procedimientos judiciales, es una facultad tradicional de la cual se les ha ido despojando a través del tiempo. Nunca podríamos esclarecer debidamente la ambigua generalización que presupone esta versión, a menos que no estemos dispuestos a enfrentarnos valerosamente con sus fundamentos.

Una regla es un pronunciamiento coactivo elaborado por un organismo, en virtud de la delegación de autoridad conferida por una constitución o por un estatuto. El mandato y la sanción necesarios para darle condición de obligatoriedad a la norma jurídica, están en la constitución o en el estatuto y no en la regla. Basta hojear cualquier manual de teoría del derecho para darnos cuenta que la condición de obligatoriedad de la norma jurídica, descansa en el reconocimiento que a tal norma otorgue, el sujeto de derecho a quien se aplica, el hombre. Vide: Introducción al Derecho—Sir Paul Vinogradoff—Fondo de Cultura Económica—(Edición del 1952)—El único medio jurídico que tiene el hombre para expresar su reconocimiento a las normas jurídicas que han de regir su vida como ciudadano de un estado, es mediante una constitución o a través del sistema de petición popular que integra el estatuto. Cuantas veces un tribunal intentara establecer normas jurídicas, por encima de la limitación constitucional o del sistema de petición popular, se produciría en derecho estricto, la anomalía de una norma sin obligatoriedad.

Lo que en realidad de derecho constituye un procedimiento no es fácil de definir. La clásica división entre derechos en ley o equidad y acciones o remedios resultaría demasiado ingenua frente a las complejidades procesales de nuestro tiempo. Cada día es más perceptible la movilidad del procedimiento

dentro de la nomenclatura sustantiva y la nomenclatura remedial. Ningún método ha logrado el deslinde absoluto. La posición más segura parece ser considerar a todo procedimiento, como una institución mixta de derecho sustantivo y de derecho adjetivo. Esto ha complicado el alegado poder de reglamentación inherente de los tribunales, porque habiéndose situado al procedimiento en una zona coalescente entre lo legislativo y lo judicial, le correspondería al legislativo la formulación de aquella parte de la norma que tuviera carácter sustantivo, quedando reducido el alegado poder inherente de los tribunales, a la formulación de aquella parte de la norma que pudiera tener carácter adjetivo.

Uno de los pocos aspectos de la cuestión donde existe cierta armonía de criterios es, que el poder inmanente de los tribunales, o sea, el poder que dimana de su propia creación como organismo jurídico, se encuentra limitado a las siguientes actuaciones: (1) adopción de reglas para su organización interna, tales como registro de causas, confección de calendarios, perfeccionamiento de apelaciones, distribución de tareas entre sus funcionarios; (2) medidas protectoras para conservar la jurisdicción; (3) medidas coactivas para el cumplimiento de sus órdenes y decretos. Pero, en el mismo instante en que la regla trascendiera de la organización interna del tribunal a la organización externa de la sociedad política, estaríamos frente a una auténtica cuestión de "procedimiento" en su doble naturaleza de norma legislativa y de norma judicial. Ahora bien, tanto dentro de las limitaciones constitucionales, como dentro de los patrones mínimos de un estatuto, los tribunales suelen crear reglas de procedimiento, propiamente dichas. Las leyes remediales nunca logran establecer un método completo para enfrentarse con todas las variantes que pueden presentarse dentro de un conflicto jurídico. Son frecuentes los casos en que los tribunales tienen que establecer, por decisión judicial, normas de procedimientos que permitan la aplicación de la ley a determinados hechos, tanto en el presente como en el futuro, si se produce una si-

tuación de identidad en los hechos jurídicos. Esta facultad dimanante de la práctica judicial, propiamente entendida, no debe clasificarse como un poder inmanente, que no necesitaría de litigación alguna para producirse, o como norma jurídica de tipo prospectivo, sino como uno de esos complejos marginales de interacción típicos de la aplicación de una ley insuficiente a unas cuestiones litigiosas concretas. El procedimiento por decisión judicial es de naturaleza transitoria; a veces sólo cubre el caso preciso donde se produce; a veces sirve como una medida provisional para enfrentarse a un vacío momentáneo creado por la legislación correspondiente; a veces la norma establecida por los tribunales resulta tan satisfactoria que se deja prevalecer por un largo período de tiempo. La norma de tipo prospectivo generalmente es de carácter legislativo. Para un estudio estrictamente jurídico, de algunos de los tópicos comentados anteriormente, véanse: 158 A.L.R. 712, 722 (1945); 110 A.L.R. 22 (1937); *Petition of Florida State Bar Ass'n for the Adoption of Rules for Practice and Procedure*, 21 So.2d 605, (1945); *Petition of Florida State Bar Ass'n for Promulgation of New Florida Rules of Civil Procedure*, 199 So. 57 (1940).

El poder de los tribunales para reglamentar procedimientos, algunas veces se hace descansar en los usos y costumbres tradicionales que prevalecían en las prácticas anteriores de los tribunales de justicia. No creemos que sea éste el momento apropiado para intentar una distinción entre "tradición" e "historia". Pero de lo que estamos seguros es, que en sentido jurídico estricto, la historia del derecho como institución pública, será siempre superior en significación a ese recuento inmemorial de algunos usos patriarcales y costumbres patrimoniales que se consumen a través del tiempo crítico, como unas formas imprecisas, demasiado rudimentarias, para tener sentido dentro de nuestra conciencia actual. El concepto "tradición" no se puede llevar a través de las aplicaciones contemporáneas de una ciencia hasta el contrasentido, de fomentar una regresión a un sistema feudal. Po-

demos partir desde el punto de vista simplemente histórico, ya que se trata de investigar el desarrollo de una institución con memoria escrita, sin que tengamos que transgredir los límites históricos más allá de lo necesario para darle sentido a nuestras propias instituciones.

América es un cuerpo histórico cuyas modalidades de formación y desarrollo tenemos que empezar a estudiar como una creación independiente, tal vez marginal, del transfondo político del derecho señorial europeo. Desde las Leyes de India (1680) hasta la adopción por el estado de Nueva York del primer código de procedimiento (1848), hay una aspiración homogénea en todo el continente hacia lo que podríamos llamar la codificación del derecho procesal americano. No tenemos espacio suficiente para establecer comparativamente en los dos países más señalados por la transición de la Edad Media a la Edad Moderna, España, Inglaterra, las implicaciones que tuviera el derecho señorial sobre la vida americana.

En cuanto a España y Puerto Rico se refiere, desde los comienzos de la colonización, la especialidad del caso americano requiere un derecho público indiano. Como cuestión de realidad, el derecho propiamente español, se usa supletoriamente para asuntos dentro de la esfera del derecho privado. Vide: Manual de Historia del Derecho Español en las Indias —José María Ots Capdequí—Editorial Losada S. A. (Edición del 1945). Nuestra primera organización judicial, como algo que pueda ser distinto a la aparatosa nomenclatura del derecho público indiano, empieza con la Real Cédula de 19 de junio de 1831, para la "Creación de la Audiencia de Puerto Rico y Alcaldías Mayores" y la Real Cédula de 17 de Febrero de 1832 para la instalación y organización del Tribunal de Comercio—Vide: Autos acordados de la Real Audiencia de la Isla de Puerto Rico y Reales Cédulas, órdenes, reglamentos, decretos y circulares comunicadas desde la instalación de dicho Superior Tribunal—Rafael García Goyena—Imprenta de Marquez (Edición del 1857). El establecimiento de un sistema judicial, tal como hoy solemos concebirlo, como una rama

separada e independiente del poder soberano, se instaura en Puerto Rico, en virtud de la Real Cédula de 30 de enero de 1855 de la Reina Isabel II. La exposición de motivos de dicha cédula podría ofrecerse como un modelo de la transformación de la Autoridad Real, a través de un tiempo americano:

"que entre las reformas encaminadas al más benéfico régimen de las provincias ultramarinas, merecen un lugar preferente las relativas a la *administración de justicia*. Abusos inveterados y prácticas ilegales con que inevitablemente el tiempo y el interés privado desnaturalizan las mejores leyes, penetraron también en el foro de las provincias de Ultramar, sin embargo de la sabia y paternal Legislación de Indias, a la cual además han sobrevenido grandes adelantos en los diversos ramos de las ciencias jurídicas de que conviene sacar provecho. Aplicadas ya algunas reformas allí donde se han mostrado más abiertamente la subversión de los buenos principios y las prácticas antilegales, encargué a Mi Gobierno que me propusiera, después de mucho estudio y detenimiento, un sistema completo de reforma judicial. Con este fin y de Orden Mía, ha venido instruyéndose en estos últimos años un expediente voluminoso en el que han emitido sus pareceres y propuesto sus proyectos de reforma tanto la Real Audiencia Pretorial de la Habana, la suprimida Chancillería de Puerto Príncipe y las demás autoridades superiores de la Isla de Cuba, como el Tribunal Supremo de Justicia, en Sala de Indias, y el extinguido Consejo Real, y en vista de los luminosos dictámenes y preciosos datos reunidos en aquel expediente, de acuerdo con Mi Consejo de Ministros, he creído llegado el caso de llevar a efecto le reforma, *teniendo en cuenta las consultas elevadas por las* Audiencias Chancillerías de Puerto Rico y de Manila, en los puntos en que aquélla podía realizarse sin inconvenientes con respecto a estas últimas provincias, tan distintas entre sí por la diversidad de su constitución social y de sus condiciones."

Lo curioso de este documento es que no sólo constituye un estatuto de organización general de la judicatura provincial ultramarina, sino un código de procedimientos. Véanse especialmente los capítulos VIII, IX, X, XI, XII y XIII.

De las fuentes auténticas del derecho histórico puertorriqueño, durante el período inicial de nuestras instituciones ju-

diciales, 1831–1855, se desprende claramente el hecho, que nuestros primeros tribunales de justicia nunca tuvieron en ningún momento el poder de reglamentación de procedimientos judiciales. Las Reales Cédulas expedidas entre 1832 y 1857, por el contrario demuestran una prolija reglamentación de la corona española sobre todos y cada uno de los aspectos procesales de la administración de justicia. No tenemos que detenernos mucho tiempo para afirmar que en el 1898, cuando se produce el cambio de régimen en nuestro país, Puerto Rico era un pueblo totalmente codificado, tanto en cuanto a derecho sustantivo como en cuanto a derecho adjetivo.

¿Era distinta la situación entre Inglaterra y Estados Unidos? Uno de los acontecimientos más significativos para el desarrollo ulterior de la ciencia del derecho en Occidente, es la conquista de Inglaterra por los normandos, (1066). Los normandos provenían en Italia, en un momento en que ya los glosadores del siglo XI habían logrado restablecer el prestigio del derecho romano, llegaban después de haber adquirido de los francos un sistema feudal superior a las rudimentarias formas políticas que hasta ese momento, habían logrado las tribus germánicas originarias y los invasores daneses. No es de extrañarse pues, que el poder político de Inglaterra, desde los tiempos de Guillermo el Conquistador, se integrase en torno a las prerrogativas, poderes y funciones de un rey, en el sentido político de la palabra. Un estudio desapasionado del Witan, o Consejo de Sabios de los primeros tiempos, del King's Council, o Consejo del Rey desde los tiempos de Guillermo el Conquistador, demostraría que el proceso de desintegración del King's Council o Consejo del Rey, es lo que produce con el transcurso del tiempo el Gran Consejo, o el Parlamento propiamente dicho, y el Pequeño Consejo, o los distintos organismos judiciales que subsisten desde Enrique II (1168) hasta el 1873 y 1875 fechas en que se adoptan las famosas "Leyes de la Judicatura." Vide: El Derecho Angloamericano—Oscar Rabasa—Fondo de Cultura Económica Edición del (1944).

Inglaterra es una paradoja viviente dentro del pensamiento político de nuestro tiempo. Es una democracia práctica lujosamente adornada de símbolos medioevales. Pero no hay que engañarse en cuanto a la integración de su poder político. A pesar de la parafernalia de su Rey, de sus lores espirituales, de sus lores cancilleres, de sus lord justicia mayor, el verdadero poder político del imperio lo tiene el Parlamento. Vide: Inglaterra, Apariencia y Realidad—D. W. Brogan— Fondo de Cultura Económica (Edición del 1944). El Rey no podría derrotar ninguna de las "peticiones del pueblo" consagrada en uno de los "estatutos" del Parlamento. Ni el Comité Judicial del Consejo Privado, ni la Cámara de los Lores, actuando como tribunal de última instancia, tendrían facultad para invalidar un estatuto del Parlamento. El estatuto del Parlamento es la Suprema Ley del estado. Toda reforma tiene que partir del Parlamento, y a pesar de la profusión de vetos, la voluntad del Parlamento prevalece en cualquiera cuestión pública, no importa a la rama del gobierno a que pertenezca. El procedimiento de invalidación de leyes por ser contrarias a la constitución, tan familiar a nuestra aura jurídica, no forma parte del proceso democrático inglés.

El Juez Patterson de la Corte Suprema de Estados Unidos hablando en el caso de *Vanhorne's Lessee* v. *Dorrance*, 2 Dallas 304, 1 L. ed. 391, (1795), se expresa así: "el poder y la jurisdicción del Parlamento,—dice Sir Edward Coke—es tan trascendente y absoluto que no puede ser limitado por los acaeceres de las causas de acción o los intereses de los litigantes. De esta Suprema Corte, (el Parlamento)—añade— se puede decir en verdad: *si antiquitaten spectes, est vetustissima; si dignitatem, est honoratissima; si jurisdictionem, est capacissima.* Tiene soberanía y autoridad incuestionable en la creación, confirmación, ampliación, restricción, abrogación, derogación, vivificación o interpretación de leyes concernientes a asuntos de toda imaginable diversidad, tanto eclesiásticas como seculares, civiles, militares, marítimas o criminales, siendo éste el sitio donde el despótico poder abso-

luto que todo gobierno necesita situar en algún sitio, está situado por la voluntad política de estos reinos. Todos los daños y perjuicios, acciones y remedios, que trascienden del curso ordinario de la justicia, están dentro del alcance de este tribunal extraordinario. Puede regular y renovar la sucesión a la corona, como lo hizo en el reinado de Enrique VIII, y Guillermo III. Puede alterar la religión establecida de la nación, como lo hizo en diversidad de ocasiones, en los reinados del rey Enrique VIII y sus tres hijos. Puede cambiar y remozar aún la constitución del reino y de los propios Parlamentos, como fué hecho por la acta de unión y varios estatutos para elecciones trienales y septeniales. Él puede en resumen, hacer todo lo que no es naturalmente imposible; y por ello, algunos no han sentido escrúpulo en designar dicho poder con un epíteto algo atrevido: 'la omnipotencia del Parlamento'. Cierto es, que cuando el Parlamento actúa no hay poder en la tierra que pueda desahacer lo hecho por él." (1 Bel. Com. 160).

De este pasaje es evidente que en Inglaterra el Poder del Parlamento no conoce límites ni restricciones. Es difícil decir lo que es la constitución de Inglaterra, porque no habiéndose consagrado en ningún documento escrito, cierto y preciso, está a la merced del Parlamento. Se pliega a cualquiera exigencia gubernamental, varía y gira impulsada por la brisa del humor legislativo y el capricho político. Algunos de los jueces de Inglaterra han tenido la audacia de afirmar, que una ley de Parlamento, en contravención a la equidad natural, es nula; pero esta opinión quebranta la posición general, que la validez de una ley del Parlamento no puede ser criticada por el Departamento Judicial; no puede ser controvertida y debe ser obedecida. El Poder del Parlamento es absoluto y trascendente; es omnipotente en la escala de la existencia política. Además, en Inglaterra no hay constitución escrita, no hay ley fundamental, nada visible, nada real, nada cierto, frente a lo cual un estatuto pueda ser comprobado. En Amé-

rica el caso es completamente distinto: cada estado de la unión tiene su constitución consagrada en un documento exacto y preciso.

Un moderado estudio que hemos podido hacer de la nomenclatura política de la Compañía de Virginia (1612), de la comunidad bíblica intentada por la Concesión al Gobernador y a la Compañía de la Bahía de Massachussets (1630), de las órdenes fundamentales de Conneticut (1662) y de la concesión a Rhode Island (1663), nos demuestra que en los orígenes norteamericanos, las funciones legislativas y judiciales eran desempeñadas conjuntamente por el mismo organismo público, y que desde el primer momento de la colonización angloamericana, el derecho público busca nuevas formas de integración, siguiendo el plan religioso, social y económico que se proponen las distintas encomiendas originarias, y es sólo en cuestiones de derecho privado, en que se acepta el derecho común inglés, como derecho supletorio, tal como en la colonización española se usara hasta 1505 el Ordenamiento de Alcalá, hasta 1567 las Leyes de Toro, hasta 1805 la Nueva Recopilación, y después de 1805 la Novísima Recopilación. En cuanto al derecho de los tribunales a regular los procedimientos judiciales que es lo que nos interesa, en la propia Inglaterra, y ya en el 1828, que es cuando se publica la novena edición del Tidd's Practices, "la práctica y los procedimientos en las cortes de Inglaterra eran una mezcla de estatutos del Parlamento y reglas elaboradas por las cortes mediante decisiones judiciales."

Los intérpretes más responsables de la contienda política que se produce en 1786 y 1787 sobre la distribución de poderes para la nueva constitución norteamericana, están contestes en que el poder judicial se organiza dentro de la constitución, rodeado por una atmósfera de recelo y de sospecha, contra lo que en aquella época se intuía como un posible "despotismo judicial", que diera al traste con la fórmula jeffersoniana para la república. No hay que esperar pues, como se ha dicho tendenciosamente tantas veces, que el poder judicial saliera

enriquecido del debate. Por el contrario salió bastante maltrecho. Vide: *Readings in Jurisprudence and Legal Philosophy—Morris S. Cohen and Félix S. Cohen—Prentice Hall Inc.* (Edición de 1951), capítulo *Law and Politics*, sección *Separation of Powers*, subtítulo *The Power of Judicial Review*, página 885.

Un glosador tan confiable de la constitución federal como resulta ser el Juez Presidente Charles Evans Hughes, posteriormente nos advierte que la autoridad que tiene en la opinión pública la Corte Suprema de. Estados Unidos, descansa sobre los siguientes pilares: (1) desde su comienzos se limitó a su tarea judicial de resolver pleitos reales y se negó a emitir opiniones sobre asuntos nacionales no sometidos a litigación ordinaria; (2) no ha entendido sobre cuestiones de naturaleza estrictamente política; (3) no ha dictaminado sobre la validez constitucional de la legislación, a menos que la declaración de inconstitucionalidad fuera imprescindible para resolver el caso, y sobre todo, (4) no ha pretendido engrandecer su poder a expensas del poder legislativo ni del ejecutivo. Vide: *La Suprema Corte de Estados Unidos—Charles Evans Hughes*—Fondo de Cultura Económica (Edición de 1946).

Después de la adopción de la constitución de Estados Unidos (1787–1788), no puede haber dudas que bajo el nuevo esquema de distribución de poderes, le corresponde al Congreso de Estados Unidos el poder de reglamentación de los procedimientos—*Williams* v. *Powers*, 135 F.2d 153, 156 (1943)—y que cuando la Corte Suprema de Estados Unidos ha hecho uso de cualquiera facultad de reglamentación ha sido en materias no cubiertas por legislación específica del Congreso o por delegación congresional: Ley del 23 de agosto de 1842—5 *Statutes at Large* 516, 518—Sobre Facultad para Promulgar Reglas de Equidad y de Almirantazgo; Ley de 1ro. de julio de 1898—30 *Statutes at Large* 544, 554, sección 30— Facultad para Promulgar Reglas en Procedimientos de Quiebra; Ley de 4 de marzo de 1909—25 *Statutes at Large* 1082, sección 25—Facultad para Reglamentar el Registro de Pro-

piedad Científica y Artística; Ley de 3 de marzo 1911—36 *Statutes at Large* 1087, 1148, sección 206,—Ley para Codificar, Revisar y Enmendar las Leyes Relativas a la Judicatura.

Resumiendo en conclusión general: (1) como hecho extraído de la realidad política de cada época, los tribunales nunca han poseído un atributo de soberanía que les confiera un poder superior al poder delegado por el soberano; (2) la confusión que algunas veces prevalece en el estudio del poder judicial, proviene de confundir las transformaciones, que a través del tiempo sufre el poder unitario del soberano, con las transformaciones de las distintas instituciones creadas para la distribución del poder del soberano; (3) una regla de procedimiento es un pronunciamiento coactivo elaborado por un organismo, en virtud de la delegación de autoridad conferida por una constitución o por un estatuto, estando el mandato y la sanción necesarios para darle condición de obligatoriedad a la regla de procedimiento en la constitución o en el estatuto, y no en la regla; (4) cada día es más perceptible la movilidad del procedimiento dentro de la nomenclatura sustantiva y la nomenclatura adjetiva, siendo la posición más segura considerar a todo procedimiento como una institución mixta de derecho sustantivo y de derecho remedial; (5) aunque admitiéramos que el poder inmanente de los tribunales fuera suficiente para reglamentar los aspectos puramente remediales del procedimiento, nunca tendría poder para reglamentar aquellos aspectos sustantivos que menoscaben, amplíen o modifiquen los derechos sustantivos de las partes; (6) el poder inmanente de los tribunales, o sea el poder dimanante de su propia creación como organismo público, se encuentra limitado a la adopción de reglas para su organización interna, medidas protectoras para conservar su jurisdicción, medidas coactivas para el cumplimiento de sus órdenes y decretos, pero en el mismo instante en que la regla trasciende de la organización interna del tribunal a la organización pública del estado, estamos frente a una auténtica cuestión de procedimiento en su doble naturaleza de norma legislativa y de norma judicial; (7) en cual-

quier aspecto que el procedimiento sea una norma sustantiva que menoscabe, amplíe o modifique derechos sustantivos de las partes, los tribunales nunca tendrían facultades inmanentes para reglamentar los procedimientos judiciales; (8) las reglas transitorias de procedimiento establecidas por decisión judicial, que se producen dentro de la resolución de cuestiones litigiosas, no debe confundirse con el alegado poder inmanente de los tribunales para regular procedimientos; (9) tradicionalmente los tribunales puertorriqueños nunca tuvieron poder para reglamentar los procedimientos; si algún estado norteamericano lo tuvo, constituye un caso aislado, por excepción, mejor que la costumbre patrimonial de la república; (10) cualquier poder de reglamentar procedimientos que tengan los tribunales, es un poder delegado por el soberano mediante una constitución o un estatuto, y no un poder dimanado de su propia creación como organismo público.

3. Otra de las conclusiones del fallo parece ser, que no siendo el derecho de apelación un derecho constitucional y sí estatutario, ni constituir por sí mismo un procedimiento que forme parte del juicio, puede estar comprendido entre las reglas de administración.

Estamos frente a una bastante peligrosa racionalización de conceptos que bien se consideren como una posible inducción para futuras normas legislativas o judiciales, o como la simple exposición de un criterio judicial, pueden acarrearle un grave daño al sentido de valores de la civilización puertorriqueña. Ningún sistema de justicia pública estará bien balanceada a menos que cualquier error judicial, tanto en la apreciación de los hechos, como en la aplicación del derecho, pueda ser corregido en la forma más completa y eficaz posible, por los organismos apelativos.

El derecho de apelación tiene una función científica superior a la simple regla de administración: (1) sirve como salvaguardia de la libertad, de la acción social, del espíritu de empresa del sujeto de derecho, dentro de los límites constitucionales; (2) sirve como medio para conservar la pureza de

los procedimientos constitucionales, mediante la supervisión por un conocimiento de mayor especialización; (3) sirve como valladar contra la anarquía judicial que supondría una práctica desigual del procedimiento, impuesta por cada tribunal a su arbitrio, mediante la formulación de un cuerpo de principios judicialmente establecidos; (4) sirve como promotor de la mayor certeza posible, tanto para la aplicación como para la interpretación de aquellos estatutos, que necesiten clarificarse a través de una norma judicial obligatoria a todos los tribunales de menor jerarquía; (5) sirve como mantenedor de una tradición ética que libre al sujeto de derecho del capricho, de la obsecación o de la pasión de los juzgadores públicos. Vide: *Criminal Appeals in América—Lester Bernkardt Orfield— Little Brown and Company* (Edición de 1939).

Igual confusión presupone el fallo en cuanto a la naturaleza constitucional, o a la naturaleza estatutoria del derecho de apelación. Los derechos constitucionales son normas generales cuyas especialidades deben prescribirse por los estatutos correspondientes. Es obligación legislativa proveer la legislación correspondiente para hacer factible el disfrute de dichos derechos. Es obligación judicial velar porque las normas especiales de tipo legislativo, que se adopten para el disfrute de los derechos constitucionales, no adulteren o evaporen las sustancias y las esencias de dichos derechos constitucionales. Si bien es verdad que generalmente el derecho de apelación no es un derecho constitucional, en el sentido de no haber sido incluído como uno de los derechos inalienables dentro de la constitución, no es menos cierto, que tan pronto como el derecho de apelación se incorpora de un sistema de justicia pública, por acción legislativa, entra a formar parte del debido proceso de ley, y por lo tanto adquiere una categoría cuasi constitucional. Esta ha sido la posición asumida por la Corte Suprema de Estados Unidos desde 1915: *Frank* v. *Mangum*, 237 U. S. 309, 59 L. ed. 969 (1915) ; *Cochran* v. *Kansas*, 316 U. S. 255, 86 L. ed.

1453, (1942); *Denial of Appeal*, 19 ALR2d 792, 795, 808, (1951); *Boykin* v. *Huff*, 121 F.2d 865 (1941).

El derecho de apelación es un procedimiento y no una regla de administración—"el procedimiento se ha definido como todo lo que constituye el método y la función reguladora de los tribunales, desde que la acción se inicia hasta que se registra sentencia final, *incluyendo el proceso apelativo*"—Vanderbilt —*Standards of Judicial Administration*—página 92 (1949). Como cuestión de hecho, el proceso apelativo se incluyó en las reglas adoptadas por la Corte Suprema de Estados Unidos para las cortes de distrito de Estados Unidos, en virtud de la delegación de poder que le fué conferida por el Congreso de Estados Unidos. Felizmente, los delegados de nuestra propia "Convención Constituyente" se ocuparon de esclarecer debidamente la diferencia que existe entre una regla de administración, (sección 7 del Capítulo V) y una regla de procedimiento o evidencia (sección 6 del capítulo V).

4. Generalmente hablando, el poder de reglamentar procedimientos es un poder legislativo—*Williams* v. *Power*, 135 F.2d 153 (1943), *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 85 L. ed. 479 (1940). Cualquiera regla adoptada por un tribunal en conflicto con un estatuto no tendría fuerza de ley— *Alaska Packers* v. *Pillsbury*, 301 U. S. 174, 81 L. ed. 988 (1937). Es posible dentro del sistema de división de poderes, que el poder de reglamentar procedimientos que tradicionalmente es un poder legislativo, pueda ser delegado a lo judicial—*The Bank of the United States* v. *Halstead*, 10 *Wheat* 51, 6 L. ed. 264 (1825); *Beers et al* v. *Haughton*, 9 *Peters* 329, 9 L. ed. 145, (1835); *Cooke* v. *Avery*, 147 U. S. 375, 37 L. ed. 209, (1893); *Delegation of Legislative Power*, 79 L. ed. 474, 500; *Petition of Florida State Bar Ass'n for the adoption of Rules for Practice and Procedure*, 21 So.2d 605, (1945).

Ahora bien, cuando la constitución establece el método para adoptar reglas de procedimiento, el método constitucional prevalece, no importa cual pueda ser la actitud legislativa

ni la acción judicial. La razón es, que tanto las legislaturas como las magistraturas, son creaciones filiales de la propia constitución:

"¿Qué es una Constitución? Es una forma de gobierno, trazada por las manos poderosas de las gentes en la cual ciertos principios primigenios de la ley fundamental del estado se establecen. La Constitución es clara y terminante; contiene la voluntad permanente del pueblo, y es la ley suprema de la nación; es superior al poder de la Legislatura, y puede ser revocada o modificada sólo por el poder que la crea.

El poder de dar vida constitucional y el de dar muerte constitucional a un principio, debe proceder de la misma fuente. ¿Que son las Legislaturas? criaturas de la constitución; ellas deben su existencia a la constitución; derivan su poder de ésta. Su misión, y como consecuencia todas sus leyes, debe conformarse a la constitución, o de otro modo serán nulas. La constitución siendo el mandato de las gentes es la representación de ellas mismas, en su soberanía original y en su poder ilimitado. · La Ley es el mandato de una Legislatura en su forma derivada y subordinada de poder. La primera es la obra del Creador, la segunda su criatura. La Constitución fija límites al ejercicio de la autoridad legislativa y prescribe la órbita dentro de la cual dicha autoridad debe girar. En resumen, la Constitución, es el sol del sistema político, alrededor del cual giran todos los cuerpos legislativos, ejecutivos y judiciales. No importa cuál pudiera ser el caso en otros países, en éste no puede haber dudas: una ley de la legislatura contraria a la constitución es absolutamente nula." *Vanhorne's Lessee* v. *Dorrance*, supra.

5. La Ley número 11 de 24 de julio de 1952, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, traslada a Puerto Rico el reformismo inglés del 1873 y 1875. Uno de los mejores glosadores del derecho angloamericano, Oscar Rabasa, en su estudio expositivo y comparado del "Common Law" dice así: "después del 1873 . . . . en virtud de las reformas legislativas expedidas por el Parlamento llamadas 'Leyes de la Judicatura' y promulgadas en 1873 y 1875, se operó una transformación radical en la organización del Poder Judicial de Inglaterra. Todos los tribunales de primera y segunda instancia . . . .. y varios otros que funcio-

naban separadamente, se fusionaron en un solo organismo jurisdiccional unitario en donde está reunido prácticamente todo el poder judicial: la Suprema Corte de la Judicatura, (entiéndase Tribunal General de Justicia en Puerto Rico), y la Corte de Apelación", (entiéndase Tribunal Supremo en Puerto Rico). La Alta Corte de Justicia está organizada en cinco "divisiones" o podríamos llamarlas, Salas, integradas, respectivamente, por cada uno de los referidos tribunales de primera instancia que quedaron fusionados en ella, a saber: la Sala de Cancillería o Equidad (*Chancery Division*), (jurisdicción en equidad de las anteriores cortes de distrito de Puerto Rico), la Sala de la Corte del Rey (*King's Bench Division*), (jurisdicción en daños y perjuicios, en expropiaciones, en causas criminales y en recursos extraordinarios y procedimientos legales especiales de las anteriores cortes de distrito de Puerto Rico), la Sala de los Juicios Ordinarios (*Court of Common Pleas*), (jurisdicción de las anteriores cortes Municipales de Puerto Rico); la Sala del Fisco (*Exchequer Division*), (jurisdicción correspondiente al anterior Tribunal de Contribuciones de Puerto Rico) y la Sala de Sucesiones, Divorcio y Almirantazgo (*Probate, Divorce and Admiralty Division*), (jurisdicción en relaciones de familia de las anteriores cortes de distrito de Puerto Rico) .... Así que, la Alta Corte de Justicia, primera parte de la Suprema Corte de la Judicatura, (entiéndase Tribunal de Primera Instancia de la Ley número 11 de 24 de julio de 1952) asumió plena jurisdicción en primera instancia en todas las ramas del derecho inglés penal, civil, fiscal o administrativa, mercantil y toda la materia abarcada por el derecho—equidad, (referencia a la sección 10 de la Ley número 11 de 24 de julio de 1952) .... generalmente un solo juez de cualquier sala basta para el funcionamiento de la misma y para ejercer la autoridad de que está investida la Alta Corte, pero para otros asuntos solo puede conocer de ellos la Sala en pleno, con la presencia de dos o más magistrados, quienes pueden ser transferidos de una sala a otra, (referencia a las secciones 3

y 19 de la Ley número 11 de 24 de julio de 1952). La Corte de Apelación (entiéndase Tribunal Supremo de Puerto Rico), segunda gran rama de la Suprema Corte de la Judicatura revisa en apelación de segunda instancia todas las resoluciones definitivas dictadas por la Alta Corte de Justicia (entiéndase Tribunal de Primera Instancia) en pleno o a través de cada una de sus salas, y las de los demás tribunales inferiores de Inglaterra. . . Son suficientes tres magistrados para constituir quorum en esta corte que actúa generalmente en dos divisiones o salas . . . (referencia a la sección 5 de la Ley número 11 de 24 de julio de 1952)." El derecho de revisión que establece la sección 19 de nuestra Ley número 11 es idéntico al *writ of error* que en la organización judicial inglesa anterior al 1873 se otorgaba para apelar de los litigios resueltos por la Corte de Juicios Ordinarios. (*Court of Common Pleas*), (entiéndase anteriores cortes municipales de Puerto Rico, a la Corte del Rey, (*King's Bench*), (entiéndase anteriores cortes de distrito de Puerto Rico). Vide: Oscar Rabasa. El Derecho Angloamericano, Capítulo "La Organización Judicial y los Tribunales en el Derecho Inglés", páginas 89, 102.

Como antes hemos dicho, la Ley número 11 de 24 de julio de 1952, es la ley adoptada por la anterior Legislatura de Puerto Rico para instrumentar el Artículo V "Del Poder Judicial" de la Constitución del Estado Libre Asociado de Puerto Rico. En cuanto al poder de reglamentación de procedimientos se refiere, es indudable que ninguna delegación de autoridad conferida a este tribunal por la anterior Asamblea Legislativa de Puerto Rico podría ser valedera, por encima del método adoptado por la propia constitución, ya que la Sección 1 del Artículo IX sobre "Disposiciones Transitorias" de dicha constitución establece, que al comenzar a regir la constitución, sólo continuarán en vigor aquellas leyes que no estén en conflicto con la constitución.

El método adoptado por la constitución es claro: se sitúa la facultad inicial de reglamentar procedimientos en el Tri-

bunal Supremo de Puerto Rico, siempre que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes, pero las reglas de procedimientos deberán remitirse a la Asamblea Legislativa, al comienzo de su próxima sesión ordinaria, y no regirán hasta sesenta días después de la terminación de dicha sesión, salvo desaprobación expresa. Es conveniente aclarar los siguientes extremos: (1) las reglas de procedimiento contempladas por la constitución son aquellas que originalmente adoptaba la legislatura, o sea, normas prospectivas que nada tienen que ver con las cuestiones litigiosas sometidas a decisión judicial, dentro de la esfera de la función judicial, propiamente dicha; (2) al limitarse la delegación de *poder constitucional* (*constitutional grant*), a aquellas reglas que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes, la forma más segura para adoptar cualesquiera reglas de procedimientos, es someterlas a la sanción legislativa para convalidar cualesquiera menoscabos, ampliaciones o modificaciones de derechos sustantivos implícitamente afectados por la nueva reglamentación, (3) el envío de las *reglas de procedimientos*, adoptadas por este tribunal a la próxima sesión ordinaria de la legislatura, forma parte del método constitucional provisto para la promulgación de dichas reglas.

En este caso, la anterior Asamblea Legislativa de Puerto Rico delegó en este Tribunal la adopción de un cuerpo de reglas para reglamentar las apelaciones del Tribunal de Distrito al Tribunal Superior, sección 19 de la Ley número 11 de 24 de julio de 1952. Formando parte la apelación del procedimiento judicial propiamente dicho, la sección 19 no resulta inconstitucional en tanto en cuanto delega una facultad, que al otro día de aprobada la ley, era privativa del Tribunal Supremo de Puerto Rico, en virtud del mandato constitucional consagrado en la Sección 6 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico.

El conflicto entre la Ley y la Constitución se produce en virtud de la sección 37, que establece: "esta ley, por ser de carácter urgente y necesaria, *empezará a regir al entrar en*

*vigor la Constitución del Estado Libre Asociado de Puerto Rico, con excepción de la sección 19,* que entrará en vigor el 15 de octubre de 1952. Mientras tanto, para apelar del Tribunal de Distrito al Tribunal Superior prevalecerá el procedimiento para apelar del antiguo Tribunal Municipal al anterior Tribunal de Distrito, vigente a la fecha de aprobación de esta ley."

Como se ve, el artículo 37 de la Ley número 11 de 24 de julio de 1952, está en conflicto con la misma constitución que trata de instrumentar, en dos aspectos: (1) en el mismo momento de entrar en vigor la constitución, ya la Asamblea Legislativa había perdido su poder tradicional de reglamentar procedimientos prospectivos y por lo tanto la facultad para reglamentar cualquier procedimiento prospectivo le pertenecía al Tribunal Supremo de Puerto Rico; de manera pues, que estaba delegando algo que ya no le pertenecía; (2) en el mismo momento de entrar en vigor la constitución, entró en vigor el método constitucional prescrito para la promulgación de nuevas reglas y por lo tanto, no podía la legislatura establecer por su cuenta un método de promulgación distinto, sin estar en conflicto con la constitución, ya que la Sección 1 del Artículo IX de la Constitución dispone, que al comenzar a regir la Constitución, sólo continuarán en vigor aquellas leyes que no estén en conflicto con la constitución.

Un examen desapasionado de la Sección 6 del Artículo V de la Constitución nos lleva a dos conclusiones inevitables: (1) que la facultad de adoptar cualquiera regla de procedimiento que no menoscabe, amplíe o modifique un derecho sustantivo, le pertenece exclusivamente al Tribunal Supremo de Puerto Rico; (2) que la facultad de adoptar cualquiera regla de procedimiento que menoscabe, amplíe o modifique un derecho sustantivo, le pertenece exclusivamente a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico. La única forma de armonizar estas dos contrariedades, producto de un lenguaje que obedece a una política constitucional distinta dentro de la clásica división de poderes, es la adopción de

una norma de colaboración estricta entre lo judicial y lo legislativo, reservando a la judicial, hasta donde sea posible, el poder de proponer las reformas remediales y a lo legislativo, hasta donde sea posible, el poder de sancionarlas, pues de lo contrario, en un asunto tan difícil como éste, de distinguir entre el carácter adjetivo y el carácter sustantivo de una norma jurídica, la interpretación de nuestra propia constitución se nos puede convertir en un juego de sutilezas. Cualquier inevitable incorporación de un derecho sustantivo a cualquiera regla de procedimiento, quedaría convalidada por el simple envío de dichas reglas a la Asamblea Legislativa de Puerto Rico.

Ha sido motivo de estudio en el presente caso, la posible facultad de la Asamblea Legislativa para autorizar a este Tribunal a promulgar reglas de procedimiento, sin necesidad de cumplir con las disposiciones de la Sección 6, del Artículo V de nuestra Constitución, como una medida transitoria para complementar y hacer efectivas las disposiciones de la Sección 2 del propio Artículo V. El razonamiento que ha producido tal conclusión podría resumirse de la siguiente manera: el día 25 de julio de 1952 entran en vigor, por una parte, la Sección 2 del Artículo V de la Constitución, que establece que "los tribunales constituirán un sistema judicial unificado en lo concerniente a *jurisdicción, funcionamiento y administración*, y por otra parte, la Sección 6 del Artículo V de la Constitución, que establece que "el Tribunal Supremo adoptará reglas de procedimiento que no menoscaben, amplíen o modifiquen derechos sustantivos de las partes", cuyas reglas así adoptadas, se remitirán para su aprobación, a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico al comienzo de su próxima sesión ordinaria y no regirán hasta sesenta días después de la terminación de dicha sesión; que por el hecho de entrar en vigor simultáneamente ambas disposiciones, hubiera sido imposible implementar la Sección 2, que creaba el sistema judicial unificado, en todo lo referente a nuevas reglas de procedimiento, a través del método para la promulgación de

reglas de procedimiento establecido por la Sección 6 del mismo artículo; que siendo esto así, alguno de los poderes constituídos debía tener facultad suficiente para enfrentarse con la situación anómala que creaba la propia Constitución; que las "Disposiciones Transitorias", contenidas en el Artículo IX de la propia Constitución, especialmente en su Sección 7, concedía a la Asamblea Legislativa de Puerto Rico poder para aprobar las leyes que fueran necesarias, a los efectos de poner en vigor la Sección 2 del Artículo V, y por lo tanto, tenía autoridad temporal para autorizar a su vez, al Tribunal Supremo de Puerto Rico, a establecer reglas de procedimiento, sin necesidad de someterlas a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico; que las reglas así adoptadas, podrían ser consideradas como medidas provisionales o transitorias que estarían en vigor, hasta tanto fueran promulgadas las reglas de procedimiento definitivas de acuerdo con el nuevo método de promulgación constitucional.

¿Hubiera sido imposible poner en vigor la Sección 2, por el simple hecho que la Sección 6 determinara un método de promulgación distinto para cualquiera regla de procedimiento? *Jurisdicción unificada* existía en Puerto Rico desde que se aprobó la ley número 432 de 15 de mayo de 1950. *¿El funcionamiento unificado*, quedaba totalmente congelado por el simple hecho que una apelación se realizara mediante un *juicio de novo* en vez de realizarse mediante un *recurso de revisión?* ¿Que impedimento insuperable representaba para una *administración unificada*, un pequeño cambio procesal, que es esencialmente de naturaleza legislativa, y no tiene nada que ver con la administración normal de los tribunales? La mejor constancia de la poca consistencia que contiene dicho razonamiento , es la propia Ley número 11 de 24 de julio de 1952, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, que entró en vigor desde el 25 de julio de 1952, en todo lo relacionado con la *jurisdicción unificada*, con el *funcionamiento unificado* y con la *administración unificada*, y tuvo *juicio de novo* hasta el 15 de octubre

de 1952, *y recurso de revisión* después del 15 de octubre de 1952, sin que se desintegrara la estructura judicial creada por nuestra Constitución.

La pretendida facultad de la anterior Asamblea Legislativa para autorizar a este Tribunal a establecer reglas de procedimiento, sin someterlas a la actual Asamblea Legislativa del Estado Libre Asociado de Puerto Rico, se hace descansar en las "Disposiciones Transitorias" de nuestra Constitución. Para los efectos de presentar un cuadro completo de la polémica, vamos a transcribir íntegramente dichas "Disposiciones Transitorias":

"Sección 1.—*Al comenzar a regir esta Constitución* todas las leyes que no estén en conflicto con la misma continuarán en vigor íntegramente hasta que sean enmendadas o derogadas o hasta que cese su vigencia de acuerdo con sus propias disposiciones.

*"Salvo que otra cosa disponga esta Constitución,* la responsabilidad civil y criminal, los derechos, franquicias, concesiones, privilegios, reclamaciones, acciones, causas de acción, contratos y los procesos civiles, criminales y administrativos subsistirán *no obstante la vigencia de esta Constitución.*

"Sección 2.—Todos los funcionarios que ocupen cargos por elección o nombramiento *a la fecha en que comience a regir esta Constitución,* continuarán en el desempeño de los mismos y *continuarán ejerciendo las funciones de sus cargos que no sean incompatibles con esta Constitución,* a menos que las funciones de los mismos sean abolidas o hasta tanto sus sucesores sean seleccionados *y tomen posesión de acuerdo con esta Constitución y con las leyes aprobadas bajo la autoridad de la misma.*

"Sección 3.—Independientemente del límite de edad fijado por esta Constitución para el retiro obligatorio, todos los jueces de los tribunales de Puerto Rico que estén desempeñando sus cargos *a la fecha en que comience a regir esta Constitución* continuarán como jueces hasta la expiración del término por el cual fueron nombrados y los del Tribunal Supremo continuarán en sus cargos mientras observen buena conducta.

"Sección 4.—El Estado Libre Asociado de Puerto Rico será sucesor de El Pueblo de Puerto Rico a todos los efectos, incluyendo, pero sin que se entienda como una limitación, el cobro y pago de deudas y obligaciones de acuerdo con los términos de las mismas.

"Sección 5.—En lo sucesivo la expresión "ciudadano del Estado Libre Asociado de Puerto Rico", sustituirá a la expresión "ciudadano de Puerto Rico" según ésta ha sido usada antes de la vigencia de esta Constitución.

"Sección 6.—Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos por la ley vigente *al comenzar a regir esta Constitución*. La Asamblea Legislativa, cinco años después de estar en vigor la Constitución, podrá cambiar estos requisitos, pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección general siguiente a la aprobación de la misma.

"Sección 7.—*La Asamblea Legislativa podrá aprobar las leyes que fueren necesarias para complementar y hacer efectivas estas disposiciones transitorias a fin de asegurar el funcionamiento del Gobierno, hasta que los funcionarios que en esta Constitución se proveen sean electos o nombrados y tomen posesión de sus cargos, y hasta que esta Constitución adquiera vigencia en todos sus aspectos.*

"Sección 8.—De crearse un Departamento de Comercio, el departamento denominado de Agricultura y Comercio en esta Constitución, se llamará Departamento de Agricultura.

"Sección 9.—La primera elección bajo las disposiciones de esta Constitución se celebrará en la fecha que se disponga por ley, pero no más tarde de *seis meses después de la fecha en que comience a regir esta Constitución* y la siguiente se celebrará en el mes de noviembre de 1956, en el día que se determine por ley.

"Sección 10.—*Esta Constitución comenzará a regir cuando el Gobernador así lo proclame,* pero no más tarde de sesenta días después de su ratificación por el Congreso de los Estados Unidos." Examinada la Sección 10 de estas "Disposiciones Transitorias" conjuntamente con el resto de las secciones de las mismas, se ve claramente que tan pronto el anterior Gobernador de Puerto Rico, quien de acuerdo con la Sección 2 de las propias "Disposiciones Transitorias" se convierte en el Gobernador del Estado Libre Asociado de Puerto Rico, proclamare la vigencia de la Constitución, todas las disposiciones de dicha Constitución empezarían a regir simultáneamente.

¿Cuál fué, en realidad de derecho, la autoridad que dichas "Disposiciones Transitorias" le concedieron a la Asamblea Legislativa? El señor Santiago Polanco Abreu, Miembro de la Comisión de Disposiciones Transitorias y Asuntos Generales de la Convención Constituyente de Puerto Rico, al informar a la Convención, sobre el alcance de dicha autoridad, se expresó en los siguientes términos:

"La Asamblea Legislativa, naturalmente, *no tendría facultades para complementar la constitución en sí,* pero sí las tendría *para asegurar el funcionamiento efectivo del gobierno hasta que los funcionarios que se proveen en esta Constitución sean electos y nombrados* y tomen posesión de sus cargos."

Como se ve, la autoridad concedida a la Asamblea Legislativa, por el propio texto de la Sección 7 del Artículo IX, no fué para aprobar las leyes que fueren necesarias para complementar y hacer efectiva la Constitución, cosa que resultaría ilógica e incomprensible, sino para aprobar *"las leyes que fueren necesarias para complementar* y hacer efectivas estas *disposiciones transitorias"*, que es lo que resulta lógico y comprensible, dentro de la transitoriedad que lleva expresa en sí misma una disposición de esta naturaleza.

Ahora bien, ¿hasta cuándo duraría esta autoridad de la anterior Asamblea Legislativa? La mejor exposición sobre el particular la hace ante la Convención Constituyente, el delegado señor José Trías Monge:

"Consideramos que la Sección 7 de esta Disposición Transitoria es absolutamente indispensable. Es una sección usual en disposiciones transitorias en las constituciones estaduales. Ésta específicamente está calcada sobre el modelo de la Constitución de New Jersey y *su único propósito* es simplemente el aclarar que deposita suficiente poder constituyente en la Asamblea Legislativa, *únicamente* para los fines de proveer para una transición adecuada *entre el momento en que entre en vigor la Constitución y el momento en que los funcionarios* que bajo ella se dispone, *son electos o nombrados y toman posesión de sus cargos . . . . . .* Es el fin básico de una disposición transitoria: *el llenar el hueco entre el momento que entra en vigor la Constitución y el momento*

*en que los funcionarios que son nombrados o electos bajo ella, han de tomar posesión de sus cargos."*

(Vide Diario de Sesiones de la Convención Constituyente de Puerto Rico a la página 819).

Tanto para enfrentarnos con el verdadero alcance del poder temporal concedido a la anterior Asamblea Legislativa, como para enfrentarnos con las implicaciones del desarrollo de dicho poder en tiempo futuro, después de la adopción por la Convención Constituyente de las "Disposiciones Transitorias" debemos dejar claramente establecido que, (1) : el poder concedido a la Asamblea Legislativa, fué exclusivamente para adoptar aquellas leyes que hicieran factible la organización política del nuevo estado creado por la misma constitución, y, (2) : el período de transición dura desde el 25 de julio de 1952, fecha en que entra en vigor la Constitución, hasta el 12 de enero de 1953, fecha en que los últimos funcionarios electos, dentro de la nueva organización política, toman posesión de sus cargos. Es claro que cualesquiera leyes adoptadas que puedan tener efecto más allá del 12 de enero de 1953, *son exclusivamente aquellas leyes relacionadas con la organización del nuevo estado político*, referentes a nombramiento o elección de los nuevos funcionarios, porque esa fué la verdadera delegación de poder constituyente.

Pero la cosa curiosa que presenta este caso, es que no fué la anterior Asamblea Legislativa, actuando bajo el poder temporal que le otorgan las "Disposiciones Transitorias" del Artículo IX, después del 25 de julio de 1952, la que aprueba la Ley de la Judicatura, sino la anterior Asamblea Legislativa, actuando bajo el poder permanente que le había otorgado la Carta Orgánica de 1917, la que aprobó dicha ley, el día 24 de julio de 1952. Bajo las disposiciones permanentes de la Carta Orgánica del 1917, la anterior Asamblea Legislativa tenía facultad para establecer procedimientos, y por lo tanto, posiblemente, poder para delegar dicha autoridad, mediante cualquier estatuto que fijara los patrones mínimos para dicha

delegación. Sin embargo, la misma anterior Asamblea Legislativa, actuando bajo las "Disposiciones Transitorias" de nuestra Constitución, no hubiera tenido facultad para reglamentar procedimientos, y por lo tanto, no hubiese podido delegar dicha facultad. Bastaría tal esclarecimiento de autoridad para dejar fuera de las "Disposiciones Transitorias" de nuestra Constitución, la Ley de la Judicatura.

El verdadero problema con que se confronta este Tribunal ahora, en lo referente a dichas "Disposiciones Transitorias" es, que habiéndose aprobado la Ley de la Judicatura, para entrar en vigor conjuntamente con nuestra Constitución, resulta una ley en conflicto con la propia Constitución, tan pronto empieza a regir, de acuerdo con el primer párrafo de la Sección 1 de las propias "Disposiciones Transitorias", en todo aquello que pretenda ser delegación de autoridad a nuestro tribunal para reglamentar procedimientos sin someterlos a la aprobación de la próxima Asamblea Legislativa del Estado Libre Asociado de Puerto Rico. Como la delegación de poder se hace prospectivamente al 15 de octubre de 1952, de acuerdo con el segundo párrafo de la Sección 1 de las propias "Disposiciones Transitorias", no se puede considerar como un procedimiento existente que entra en vigor conjuntamente con la Constitución, sino como un procedimiento a adoptarse después de estar vigente la Constitución, quedando, por lo tanto, sometido a todas las restricciones impuestas a las distintas ramas del nuevo Gobierno, por la propia Constitución. Lo que habría que resolver en realidad de derecho, es, si la Asamblea Legislativa, actuando bajo la autoridad de la anterior Carta Orgánica del 1917, y no bajo el poder temporal de las Disposiciones Transitorias, podía aprobar una ley, que al entrar en vigor nuestra Constitución, resultara incompatible con nuestra Constitución. No puede haber la menor duda, vista la Sección 1 del Artículo IX de la propia Constitución, que ni la anterior Asamblea Legislativa, actuando bajo la autoridad de la Carta Orgánica del 1917, ni la misma Asamblea Legislativa, actuando bajo la autoridad de las "Disposi-

ciones Transitorias" del Artículo IX, hubiera tenido poder para aprobar una ley para tener efecto después del 25 de julio de 1952 que estuviera en conflicto con nuestra Constitución.

Se ha pretendido afirmar que el hecho de entrar en vigor simultáneamente la Constitución del Estado Libre Asociado de Puerto Rico, y la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, creó una situación especial que no hubiera permitido la actuación de los poderes normales constituídos por la propia Constitución. Tal afirmación carece en absoluto de exactitud. Para demostrarlo tenemos que reducir a su justa proporción la cuestión litigiosa. No se trataba de poner a funcionar el sistema judicial unificado, según ya hemos visto, ni de adoptar un nuevo sistema global de procedimientos, sino de promulgar una simple reglamentación, cubriendo los aspectos puramente procesales, de un recurso de revisión. Si se partía de la base que la anterior Asamblea Legislativa tenía poder temporal para complementar la Constitución, han podido remitirse dichas reglas a la anterior Asamblea Legislativa para su aprobación, antes del 11 de agosto de 1952. Si se partía de la base que la anterior Asamblea Legislativa no tenía poder, han podido enviarse a la Primera Legislatura Ordinaria de la Primera Asamblea Legislativa de Puerto Rico del Estado Libre Asociado de Puerto Rico, después del 12 de enero de 1953. Como cuestión de hecho dichas reglas fueron confeccionadas antes del 15 de octubre de 1952 y puestas en vigor desde el 15 de octubre de 1952. Aunque se trate de una simple reglamentación, cubriendo los aspectos puramente procesales de un recurso de revisión, resulta enajenado, en aras de una transitoriedad y de una temporalidad altamente improbables, el derecho de una Asamblea Legislativa a impartirle su sanción al criterio cuasi legislativo de una magistratura. Todavía resulta más indefendible la tesis de la transitoriedad cuando se piensa que éste es un asunto, que se resuelve indefectiblemente, en torno a los derechos constitucionales de todo un pueblo.

Es, por lo tanto, más conveniente a los altos intereses públicos envueltos en esta cuestión, dejar claramente establecido, que desde el 25 de julio de 1952, nuestra Constitución entró en vigor en su totalidad, y desde ese momento nuestro pueblo obtuvo el pleno goce de todos los derechos consagrados en la misma, y todos los organismos de nuestro gobierno quedaron sometidos a las restricciones impuestas por dicha Constitución. Consagrar lo contrario, sería confundir el poder transitorio otorgado a un organismo, para aprobar unas leyes que hicieran factible la celebración de unas elecciones o la creación de algunos cargos adicionales en el gobierno, con el poder inalienable de un pueblo para organizar su vida de acuerdo con su propia voluntad política. La Constitución del Estado Libre Asociado de Puerto Rico es la primera oportunidad que se le brinda a un pueblo de sentirse libre dentro de algo creado por él mismo. Hay que defenderla con una profunda lealtad de espíritu, como nuestra única carta de triunfo ante el porvenir. Si vamos a desarrollar ante ella la misma usura de ánimo que ante nuestras cartas coloniales, la dejaremos profundamente mutilada para el porvenir.

El envío a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico de cualesquiera reglas de procedimiento, adoptadas por este Tribunal, es un deber constitucional indeclinable del Tribunal Supremo de Puerto Rico, de cuyo deber no puede ser relevado por la Asamblea Legislativa de Puerto Rico. El hecho de no haberse enviado dichas reglas a la próxima sesión ordinaria de la Asamblea Legislativa implica indefectiblemente, que a esta fecha, dichas reglas no han sido promulgadas de acuerdo con el método de promulgación provisto por nuestra Constitución, y no tienen fuerza de ley.

Estamos conformes con el peticionario que el efecto práctico de declarar inconstitucional un estatuto, es dejar vigente la legislación anterior: *Ex parte Davis*, 21 Fed. 396 (1884); *McAllister* v. *Hamlin*, 23 Pac. 357 (1890); *Carr* v. *State*, 26 N.E. 778 (1891); *People* v. *Bulter St. Foundry & Iron*

*Co.*, 66 N. E. 349 (1903); *State* v. *Mills*, 133 S. W. 22 (1910); *People* v. *Fox*, 128 N.E. 505 (1920); *Frost* v. *Corporation Commission*, 278 U. S. 515, 73 L. ed. 483 (1929); 66 A.L.R. 1483 *Anno.* (1930); *Conlon* v. *Adamski*, 77 F.2d 397 (1935), sobre todo, en un caso como el que nos ocupa, que si bien es verdad que existe un cambio en el aspecto puramente sustantivo de la cuestión remedial, o sea, cambiar un juicio *de novo* por un recurso de apelación, no es menos verdadero que la delegación de poder para reglamentar los aspectos puramente procesales del nuevo recurso, es inconstitucional, y por lo tanto resulta un recurso vacío, sin ninguna efectividad constitucional que lo haga obligatorio para el sujeto de derecho. Atendiendo tanto al espíritu del segundo párrafo de la Sección 1 del Artículo IX de las "Disposiciones Transitorias" de nuestra propia Constitución, que deja existente todo procedimiento en vigor, no derogado expresamente por la Constitución y a la letra de la sección 2 de la propia Ley de la Judicatura, creemos que el efecto práctico de declarar inconstitucional la sección 37 de la misma ley, en tanto en cuanto pone en vigor la sección 19 al 15 de octubre de 1952 es dejar existente el anterior procedimiento apelativo del juicio *de novo*.

Siempre resulta un poco mortificante la limitación del propio poder. Pero ante el dilema de adscribirnos involuntariamente a ese tipo de cultura espuria que arrastra consigo la dictadura, no importa la esfera donde se produzca, preferimos la mortificación a la complacencia. Como custodios máximos de la Constitución del Estado Libre Asociado de Puerto Rico, nuestro deber es mantener en toda su pureza, este balance entre el poder conservador que siempre encarnan las magistraturas, y el poder renovador que siempre representan las legislaturas, sin defraudar la tradición democrática que inspira a nuestra propia Constitución. Disiento.